The NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE et al., Petitioners,

v.

The FEDERAL POWER COMMISSION, Respondent.

No. 72–1959.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 29, 1973.

Decided Feb. 5, 1975.

Certiorari Granted Oct. 14, 1975. See 96 S.Ct. 186.

Howard A. Glickstein, Washington, D. C., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom William L. Taylor, Notre Dame, Ind., was on the brief, for petitioners.

John H. Burnes, Atty., Federal Power Commission, with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Jr., Acting Sol., Federal Power Commission, were on the brief, for respondent.

Martin Slate, Atty., E. E. O. C., as amicus curiae. Julia P. Cooper, Asst. Gen. Counsel, E. E. O. C., and Beatrice Rosenberg, Atty., E. E. O. C., filed a brief on behalf of the E. E. O. C. as amicus curiae urging reversal.

Before BAZELON, Chief Judge, and McGOWAN and MacKINNON, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

This petition for direct review of an order of the Federal Power Commission raises a question as to the precise scope of the regulatory authority vested in that agency by the Congress. It concerns in particular a request made of the Commission, and dismissed by it for lack of jurisdiction, to initiate rule making proceedings in respect of asserted employment discrimination by its regulatees. Because of the confused and contradictory manner in which the important jurisdictional issues involved in this case are presented by all parties to this appeal, we vacate the Commission's order of dismissal, and remand the case for further consideration in light of this opinion.

I

Petitioners are a number of organizations concerned with advancing the interests of black, Spanish surnamed, native, and female Americans. Charging widespread discrimination in the employment of these groups by natural gas and electric utility companies, they petitioned the Commission for "the issuance of a rule requiring equal employment opportunity and nondiscrimination in the employment practices of its regulatees,[1] and attached to their petition a "proposed rule," which we append to this opinion. We recount its operative provisions.

Section 2 declares that equal employment opportunity will be considered an element of the "public interest," a criterion by which the Commission must make many of its rate making and licensing decisions. Section 3 details the substantive duties of regulatees not to discriminate in any employment practice on the basis of race, color, religion, sex or national origin. Sections 4 and 5 impose on regulatees the duty to devise and to implement affirmative "equal employment opportunity programs," the general purpose of which is to involve every regulatee in a "continuing campaign to exclude every form of prejudice or discrimination . . . from its personnel policies and practices," and the specific contents of which are to include such measures as the active recruitment of minority and female employees through advertisement in media having significant circulation among those groups, the avoidance of selection techniques and tests that have the effect of disadvantaging minority groups and females, and the publication to the regulatee's management staff and employees of a rigid anti-discrimination policy.

Section 6 of the proposed rule requires each regulatee to file annually with the Commission a copy of the "EEO–1" form which it already must file annually with the United States Equal Employment Opportunity Commission. Section 7 makes it a necessary part of each regulatee's application for a rate change, license or other necessary Commission approval that a report be submitted on the nature and success of the regulatee's affirmative "equal employment opportunity program" and on any complaints of employment discrimination that have been made against the regulatee. Section 9 obligates the Commission to entertain individual complaints of employment discrimination by regulatees, and to conduct hearings and issue decisions and orders pursuant to its existing procedural regulations.[2]

The proposed rule's section 10 authorizes intervention by complainants of employment discrimination in any rate making or licensing proceeding involving the regulatee complained against. Section 11 reinforces section 2, described

---

1. Petition of NAACP, et al.; FPC Docket No. R–447, JA 1.

2. Such of those complaints as claim violations of any provision of Title VII of the Civil Rights Act of 1964 may be referred to the Equal Employment Opportunity Commission.

above, by specifying that a regulatee's record of compliance with the proposed rule will be given "material consideration" by the Commission when it passes on any request by that regulatee for a rate change, license, or other necessary Commission approval, with Commission action on such requests being denied or conditioned accordingly. Section 14 imposes, for violation of the proposed rule, the usual $500-a-day fine for violation of Commission rules.

·The response of the Commission was to treat the petition for rule making as one for a declaratory order, and to issue such an order, the substance of which was a refusal to initiate the requested rule making on the ground that the Commission had "no jurisdiction to adopt such a rule."[3] When they requested a rehearing by the Commission, petitioners appended a letter supporting their position from the Chairman of the Equal Employment Opportunity Commission, at 90, which agency has also filed an *amicus* brief with this court. The Commission denied the petition for rehearing as "setting forth no new facts or principles of law," *id.* at 93, and the way was thus cleared for this direct review proceeding.

A close analysis of the procedural posture of this appeal reveals a double ambiguity. By requesting "*a rule* requiring equal employment opportunity and non-discrimination in . . . employment practices," the petitioners left unclear whether they were asking for their proposed rule and no other, or merely for a rule making proceeding on the subject of employment discrimination generally, with the proposed rule perhaps serving only as a model or point of departure.

By asserting its lack of jurisdiction to adopt "*such a rule,*" the Commission in turn left unclear which of these requests it was denying its jurisdiction to grant. We do not know whether its order asserted a lack of jurisdiction to adopt (1) the specific proposed rule, or (2) *any* rule relating to employment discrimination by regulatees.

The ambiguity is unfortunately not resolved by examining the positions taken by the parties in the record and in their briefs. In their petition for rule making, petitioners first proposed the adoption of "a rule" relating to employment discrimination, but then went on to ask the Commission more expansively to "[p]rescribe *regulations* prohibiting discrimination . . . and assuring equal opportunity in the employment practices of its regulatees." (Emphasis added.) *Id.* at 3. The Commission's opinion denying the rule making petition, although it devoted considerable attention to the jurisdictional problems raised by certain aspects of the proposed rule in particular and concluded by denying its jurisdiction to adopt "such a rule," stated at an earlier point that "[t]he Commission lacks the legal authority to promulgate equal employment opportunity *regulations* . . because it lacks the requisite delegation of Congressional authority to act *in that area.*" (Emphasis added). *Id.* at 57, 75–77.

The confusion persists in the briefs filed in this court. In footnote 87 (at p. 54) of their brief, petitioners respond to the Commission's objections to particular aspects of the proposed rule, one such objection being that it would result in public disclosure of information protected from such disclosure by the Civil

---

**3.** JA 56, 77. We note in passing that there is some uncertainty as to what exactly is before us for review. We are confronted with what is styled a declaratory order, though why the Commission thought this the proper medium through which to assert a jurisdictional barrier to the requested rule making is not clear to us. The procedural waters have been further muddied by the wording of the Commission's formal order, which dismissed the petition "as described above," *id.* at 77, the Commission having treated the petition as one for a declaratory order. It might therefore be said that what we are confronted with is not even a declaratory order refusing to initiate rule making, but a declaratory order refusing to issue a requested declaratory order. We pass over these ambiguities, however, preferring to treat the Commission as having done exactly what in substance it did do, namely, to refuse on jurisdictional grounds to initiate the requested rule making.

Rights Act. The petitioners' answer that "[w]e are confident that sufficient expertise and competence exists at the Commission to devise a rule against employment discrimination that would be effective and in harmony with other laws and regulations," suggests that petitioners do not view themselves as having asked for and been denied a specific proposed rule but rather rule making in general. On the other hand, they conclude their brief in this court by asking "that the Federal Power Commission be directed to proceed with utmost dispatch in *issuing the rule requested.*" (Emphasis added.) *Id.* at 54, 68–69.

Similarly, the Commission in its brief (at 3–4) states in one sentence that it "dismissed the petition for lack of jurisdiction to adopt the requested rule," and in the next sentence states that it "denied the requested relief because, in its view, it lacked the requisite Congressional authority to promulgate equal employment opportunity regulations. . . ." Further, there are internal contradictions in the Commission's brief. It states the issue to be whether it has any jurisdiction, in the course of discharging its regulatory responsibilities, to take the existence of proven employment discrimination into account, and broadly argues that it does not. However, at one point in its brief (at 30) the Commission says:

> . . . [I]t will suffice to say that no costs can be passed on to the ultimate consumer without the approval of the Commission. If any party wishes to challenge the propriety of certain costs, *e. g.,* those incurred through discriminatory employment practices, he is free to intervene and make his position known in the appropriate rate proceeding.

It is obvious that a concession of this kind is not compatible with any flat statement that the Commission has no authority to consider the fact of employment discrimination in its public interest determinations.

In its *amicus* brief the EEOC states the "Question Presented" as that of

Whether the Federal Power Commission in exercising its public responsibilities has the authority to consider the discriminatory employment practices of its regulatees, or whether it must ignore such discrimination on the basis of Race, sex, or national origin, no matter how blatant or wide-spread?

It indicates generally in its brief that the issue is whether the FPC has jurisdiction to adopt *some* rules relating to employment discrimination, stating at one point (at 4–5) that "we do not argue that the Power Commission is required to consider every complaint of discrimination against a utility which it regulates . . . [but only that it cannot] ignore wide-spread general discrimination. . . ."

It is possible that the parties are closer together than they think. Whether this is true or not, the case is before us on representations by both sides which, on close analysis, suggest that the parties may be talking past each other. We cannot ignore the fact that this confusion exists, for it is crucial to our disposition, as will become clear from the discussion hereinafter of the apparent boundaries of the Commission's jurisdiction. From this point forward it is important to distinguish between two kinds of jurisdiction: One—to which the proposed rule extends—embraces power on the part of the Commission to prescribe personnel practices in detail and to receive complaints, adjudicate them, and punish directly infractions of those practices. The other—which even the Commission appears to contemplate may exist—is power to take into account, in the performance of its regulatory functions, including licensing and rate review, evidence that the regulatee is a demonstrated discriminator in its employment relations.

II

Petitioners assert first a statutory and then a constitutional basis for their claims of broad Commission jurisdiction over the employment practices of regula-

tees.[4] We shall consider these in the same order, concluding that the Commission is neither empowered nor required to adopt the rule as proposed, but that it does possess jurisdiction of the more limited kind conceded by it in its brief.

There is one preliminary observation to be made. In arguing for their proposed rule, petitioners emphasize the great importance of the fight against employment discrimination. While reiterating our belief in that importance, we must also note the limited relevance of that belief to this appeal. For one thing, Congress need not be accused of slighting the importance of achieving equal employment opportunity merely because of a decision on its part that this task is not one it chose to assign to the Federal Power Commission. There are good reasons why Congress might have reached such a decision. The goal itself might have been thought better served by centralizing responsibility for its achievement (in the Justice Department and the Equal Employment Opportunity Commission, for example) rather than by diffusing it among many and thus suffering a loss in the degree of accountability and a gain in the number of jurisdictional overlaps and conflicts.

More important, Congress may have felt that other significant goals would be inadequately served if the attentions of the agencies set up to pursue them were divided. The Commission's principal task of passing on statutorily specified license and rate applications is prodigious.[5] To perform it, a staff has been built up of specialists in the technical aspects of gas and electric power production and distribution. The unfamiliar problems of employment discrimination regulation might divert an inordinate amount of their energies and skills from the ends to which these are most productively applied.

This discussion of the merits of combining in one agency the responsibilities for insuring efficient power production and for curtailing employment discrimination is obviously much abbreviated. We do not prolong it, however, for the reason that, beyond assuring ourselves that it would not be unreasonable for Congress to divide these responsibilities or to allocate their sharing in differing manners and proportions, we are not concerned with why Congress may have done so, but whether it did; and to that question we now turn.

A. *The Relevant Statutes.*

1. *Federal Water Power Act.*

The Commission was first brought into being by the Federal Water Power Act

---

4. Petitioners' brief contains a third section in which arguments are made that (1) no other federal law "preempts" the Commission from acting to proscribe employment discrimination by regulatees and (2) the Commission's doing so would effectively promote the national policy against such discrimination. Br. 45–54. A claim of "preemption," if it is at all distinct from the assertion that statutory authority is simply lacking, adds only the notion that such authority might once have existed and been withdrawn. In fact no such distinct contention appears to have been made by the Commission, and, accordingly, we do not treat the matter separately. Neither do we treat separately the alleged potential efficacy of the Commission in combatting employment discrimination, of which the only apparent relevance to this appeal is the possible inference that Congress should not be considered to have eschewed the use of so powerful a weapon.

5. The dimensions of the task are suggested by a partial list of applications to, and actions by, the Commission during fiscal 1973: 56 wholesale electric rate increase applications; 11 electric company sale and consolidation applications (all disposed of); 75 electric company securities issuance applications (all disposed of); 116 electric power project license and permit applications (90 disposed of, leaving 529 pending); 215 pipeline rate increase applications; 280 pipeline construction certificate applications (212 disposed of, leaving 214 pending); 6,844 gas producer rate increase applications; 1,383 gas producer certificate applications (955 disposed of, leaving 2,059 pending); 216 gas producer abandonment applications (171 disposed of, leaving 287 pending). FPC, 1973 Annual Report 19, 20, 41, 56, 58, 59, 60 (1973).

of 1920.[6] The principal powers delegated to it by that Act, along with the stated criteria for their exercise, are as follows: to issue licenses, with appropriate conditions, for "necessary or convenient" navigation and power projects on Federal waterways;[7] to recommend that "the development of any water resources for public purposes . . . be undertaken by the United States itself," refusing to renew existing licenses on that account;[8] to require modification of proposed projects in order to effect a "comprehensive plan" for the use of Federal waterways in commerce, power generation, and "other beneficial public uses, including recreational purposes";[9] to regulate the operation of licensed projects "for the protection of life, health, and property";[10] in the absence of state regulation, to regulate security issuances by licensees, and also to set "reasonable, non-discriminatory, and just" rates for interstate sales of power from licensed projects.[11]

On its face, the Act thus displays a primary congressional concern for the orderly and coordinated development of water resources, and also for interstitial Federal regulation of the sale of power derived therefrom. Otherwise, the only expressed concern with the internal operations of licensees relates to health and safety features of licensed projects. Broad references to the "public interest," on which petitioners place such great emphasis, are rare in the Act. Where they do occur, moreover, they strongly suggest by their contexts that what is meant is not the public interest generally, but the public's interest in the opti-

mal use of the waterways. Thus, Section 4 requires that contemplated improvements in waterways be "desirable and justified in the public interest *for the purpose of improving or developing a waterway* . . . (emphasis added)."[12]

The legislative history of the Act holds few surprises. It reveals a Congress whose attention was steadily fixed upon two principal objectives: to exploit the hydro-electric resources of a nation that even then was energy-deficient,[13] and to substitute for its earlier piecemeal approach to the problem a method of comprehensive planning which would accomplish, among other things, the conservation of natural resources.[14]

### 2. Federal Power Act.

The Commission's authority was substantially broadened by the Federal Power Act, enacted as Title II of the Public Utility Act of 1935.[15] Among its newly delegated powers were the following: to order such interconnections of electric power transmission facilities, setting such terms and conditions for the same, as are "necessary or appropriate in the public interest";[16] to approve such asset sales and consolidations of interstate electric power companies as are "consistent with the public interest;[17] to approve such securities issuances by those companies as are "compatible with the public interest" and "consistent with the proper performance . . . of service as a public utility";[18] to determine "just and reasonable" rates for interstate sales and transmissions of electric power;[19] and to order that "proper,

---

6. 41 Stat. 1063 (June 10, 1920), *as amended* 16 U.S.C. §§ 791a–823 (1970).

7. 16 U.S.C. §§ 797(e), 799, 817 (1970).

8. *Id.* §§ 800(b) and (c), 807.

9. *Id.* § 803(a).

10. *Id.* § 803(c).

11. *Id.* § 813.

12. *Id.* § 797(e). *See also id.* §§ 797(g), 800(a).

13. *See* H.R.Rep.No. 61, 66th Cong., 1st Sess. 4–5 (1919); S.Rep.No. 180, 66th Cong., 1st Sess. 2–3 (1919).

14. *See* H.R.Rep.No. 61, *supra* note 36, at 2–3; *Scenic Hudson Preservation Conference v. FPC*, 354 F.2d 608, 613 (2d Cir. 1965). *See also Udall v. FPC*, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967).

15. 49 Stat. 803, 838 (Aug. 26, 1935), *as codified* 16 U.S.C. §§ 824–25 (1970).

16. 16 U.S.C. § 824a (1970).

17. *Id.* § 824b.

18. *Id.* § 824c.

19. *Id.* § 824e.

adequate or sufficient" interstate power service be rendered.[20]

The Act's preamble echoes the generality of the foregoing quoted phrases, declaring that the sale and transmission of electric power are "affected with the public interest," federal regulation of interstate aspects being "necessary in the public interest."[21] The statute itself nowhere defines the "public interest," but instead leaves the precise ambit of the Commission's concern uncertain. Of the Commission's primary task there is no doubt, however, and that is to guard the consumer from exploitation by non-competitive electric power companies. The Act itself speaks of "assuring an abundant supply of electric energy throughout the United States with the greatest possible economy."[22] It was passed in conjunction with the Public Utility Holding Company Act of 1935, whose stated policy was to undo the effects of the holding companies' exercising undue control over the power industry, one of these effects being excessive charges to subsidiaries because of "an absence of arm's-length bargaining [and] restraint of free and independent competition."[23] Congress's central concern with exploitation is of course reflected in the statute's emphasis on just and reasonable prices, as well as by its frequent references to the financial and accounting aspects of electric company operations.[24] The legislative history of the Act adds little to our understanding. It reveals that Congress's goal was, once again, the "planned coordination of the facilities of the industry which alone can produce an abundance of electricity at the lowest possible price.[25]

### 3. Natural Gas Act.

The Natural Gas Act of 1938[26] further empowered the Commission, in part: to approve imports and exports of natural gas unless it finds that these "will not be [in] the public interest";[27] to set "just and reasonable" rates for the interstate transportation and sale of natural gas;[28] to order such expansions and interconnections of natural gas transportation facilities as are "in the public interest" and do not impose an "undue burden";[29] to disallow abandonments except as the "public convenience and necessity permit[s]";[30] and to license interstate transportation and sale of gas by reference to the "public convenience and necessity."[31]

As in the case of the Federal Power Act, the statute's preamble declares that interstate gas operations are "affected with a public interest" and must "in the public interest" be regulated, but leaves the exact content of these terms in doubt. Again, however, there is no question that the exploitation of the gas consumer was uppermost in Congress's mind. The statute begins with a reference to certain reports made by the Federal Trade Commission, the central conclusion of which had been that anticompetitive practices and overconcentration of control in the natural gas industry were leading to the payment of excessive prices by the consumer.[32] The statute evinces the same concern for "just and reasonable" rates as does the Feder-

---

20. *Id.* § 824f.

21. *Id.* § 824(a).

22. *Id.* § 824a. *See also id.* § 825s (government-produced power to be disposed of "in such a manner as to encourage the most widespread use thereof at the lowest possible rates to consumers").

23. Public Utility Holding Company Act of 1935 § 1(b)(2), 15 U.S.C. § 79a(b)(2) (1970).

24. *See* 16 U.S.C. §§ 824g, 824h(b), 825(a), 825a, 825c, 825h.

25. S.Rep.No. 621, 74th Cong., 1st Sess. 17 (1935).

26. 52 Stat. 821 (June 21, 1938), *as codified*, 15 U.S.C. § 717 *et seq.* (1970).

27. 15 U.S.C. § 717b (1970).

28. *Id.* § 717c and d.

29. *Id.* § 717f(a).

30. *Id.* § 717f(b).

31. *Id.* § 717f(e).

32. *See* Federal Trade Commission, Final Report to the Senate Pursuant to S.Res.No. 83, 70th Cong., 1st Sess. S.Doc.No. 92, Pt. 84–A, 70th Cong., 1st Sess. (1936) at 581–617, *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 610, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

al Power Act, with an added preference for decreasing rather than increasing those rates,[33] and there is the same frequency of reference to the financial and accounting aspects of gas company operations.[34]

The elements of the "public interest" are never detailed in the congressional debates and reports, but there are innumerable references to the problem of consumer exploitation.[35] Indeed, the Act as originally passed stated its primary concern with this problem in as many words:

> . . . [I]t [is] the intention of Congress that natural gas shall be sold in interstate commerce for resale for ultimate public consumption for domestic, commercial, industrial, or any other use at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest.[36]

The quoted passage was lost to later amendments, but these were not intended as revisions either of Congress's objective or of the Commission's charter.[37]

B. *FPC Regulation of Employment Discrimination Per Se.*

The more extensive of the two kinds of jurisdiction described above—that consistent with the adoption of the petitioners' proposed rule—would in our view necessarily entail a power on the Commission's part to regulate employment discrimination *per se*, a power, in other words, to act to curtail employment discrimination merely for the sake of seeing that practice curtailed. The Commission could only have such power, of course, if the curtailment of employ-

ment discrimination were itself among the Commission's statutorily defined objectives. To judge the validity of the proposed rule, therefore, we must first ask whether the Congress did indeed entrust to the Commission this particular responsibility.

Judicial precedent suggests that the Commission's responsibilities are limited to those that we have identified above in discussing the statutes and their histories. The courts have, for example, described the Federal Water Power Act as "the outgrowth of a widely supported effort on the part of conservationists," *Scenic Hudson Preservation Conference v. FPC*, 354 F.2d 608, 613 (2d Cir. 1965), and have stated that a "major purpose of the whole [Federal Power] Act is to protect consumers against excessive prices." *Pennsylvania Water & Power Co. v. FPC*, 343 U.S. 414, 418, 72 S.Ct. 843, 845, 96 L.Ed. 1042 (1952). It has been said that the Commission's task under the Natural Gas Act is to effect "a balancing of the investor and the consumer interests," on the one hand, to see that "the return to the equity owner [is] sufficient to maintain confidence in the financial integrity of the enterprise, so as to maintain its credit and attract capital," and, on the other, to "protect consumers against exploitation at the hands of natural gas companies." *FPC v. Hope Natural Gas*, 320 U.S. 591, 603, 610, 64 S.Ct. 281, 289, 88 L.Ed. 333 (1944).[38]

■ A concise description of the principal objectives of Commission activity must therefore be the following: first, to oversee the orderly development of water power and other natural resources, and, second, to bring about the production of power in the greatest possible

---

**33.** The Commission may decrease but not increase rates on its own motion. 15 U.S.C. § 717d (1970).

**34.** *See* 15 U.S.C. §§ 717h, 717, 717m(b), 717*o*, 717p(b).

**35.** *See* S.Rep.No. 1162, 75th Cong., 1st Sess. (1937); H.R.Rep.No. 709, 75th Cong., 1st Sess. (1937); 81 Cong.Rec. 6720–33, 9314–17 (1937).

**36.** Natural Gas Act § 7(c), 52 Stat. 821, 825 (1938) *as amended*, 15 U.S.C. § 717f (1970).

**37.** Act of Feb. 7, 1942, 56 Stat. 83 (1942), as codified 15 U.S.C.§ 717f(c)–(h). *See also* H.R. Rep.No. 1290, 77th Cong., 1st Sess. (1941).

**38.** *See also Atlantic Refining Co. v. Public Service Commission of New York*, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959) ("purpose of the Natural Gas Act was to underwrite just and reasonable rates to the consumer").

quantity and at the lowest possible cost to the consumer in the long run—in the economist's terms, to insure the efficient performance of an industry in which the normal forces of competition are for one reason or another not equal to the task.[39]

Petitioners maintain, however, that the Commission may properly concern itself with employment discrimination *per se* under the statutory command to the Commission to regulate "in the public interest," and by similar vague criteria. We turn, then, to the question of the proper interpretation of these criteria, and thereafter to a consideration of whether our views are consistent with prior decisions of analogous questions of agency jurisdiction.

### 1. The "Public Interest."

The Supreme Court has stated that the words "public interest" do not constitute a "mere general reference to the general welfare, without any standard to guide determinations." Rather the Court, in interpreting the Interstate Commerce Act, insisted that "the term 'public interest' . . . has direct relation to the adequacy of transportation service, to its essential conditions of economy and efficiency, and appropriate provision and best use of transportation facilities . . . ." *New York Central Securities Co. v. United States,* 287 U.S. 12, 24, 53 S.Ct. 45, 48, 77 L.Ed. 138

(1932). As was succinctly said in *McLean Trucking Co. v. United States,* 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944), also involving the powers of the Interstate Commerce Commission, its primary statutory objective of insuring efficient transportation service is "the Commission's guide to 'the public interest'." *Id.* at 82, 64 S.Ct. at 378.

We ourselves noted in *Alabama Electric Cooperative Inc. v. SEC,* 122 U.S. App.D.C. 367, 353 F.2d 905, 907 (1965), *cert. denied,* 383 U.S. 968, 86 S.Ct. 1273, 16 L.Ed.2d 309 (1966), that

> "[w]ords like 'public interest' . . ., though of wide generality, take their meaning from the substantive provisions and purposes of the Act."

And in a recent case where the jurisdiction of the FPC in particular was at issue, we declared that:

> A particular statute may have such a setting that, on consideration of its legislative history, the nature of the agency, and breadth of responsibility involved, and other material factors, a court may come to the conclusion that though its public interest language is broad its meaning in context warrants a relatively restricted reading.

*City of Lafayette v. SEC,* 147 U.S.App. D.C. 98, 454 F.2d 941, 948 (1971), *aff'd sub nom. Gulf States Utilities Co. v. FPC,* 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973).[40]

---

**39.** A particularly lucid elaboration of this latter function was given by Judge Wright in *Northern Natural Gas v. FPC,* 130 U.S.App. D.C. 220, 399 F.2d 953, 959 (1968):

> . . . [The] basic goal of direct governmental regulation through administrative bodies and the goal of indirect governmental regulation [through the] antitrust law is the same—to achieve the most efficient allocation of resources possible. For instance, whether a regulatory body is dictating the selling price or that price is dictated by a market free from unreasonable restraints of trade, the desired result is to establish a selling price which covers costs plus a reasonable return on capital . . . . .

*See also Lynchburg Gas Co. v. FPC,* 119 U.S. App.D.C. 23, 336 F.2d 942, 949–50 (1964).

**40.** *See also National Broadcasting Co. v. United States,* 319 U.S. 190, 216, 219, 63 S.Ct. 997, 1011, 87 L.Ed. 1344 (1943) (FCC not empowered by "public interest" criteria to act upon "generalities unrelated to the living problems of radio communication"); *Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co.,* 289 U.S. 266, 285, 53 S.Ct. 627, 636, 77 L.Ed. 1166 (1933) ("public interest" to be interpreted in light of "its context . . . the nature of radio transmission and reception, [and] . . . the scope, character, and quality of service"); *Banzhaf v. FCC,* 132 U.S.App. D.C. 14, 405 F.2d 1082 (1968) ("Especially with First Amendment issues lurking in the background, the 'public interest' is too vague a criterion for administrative action unless it is narrowed by defineable standards."), *cert. denied,* 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93

■ We must conclude, therefore, that Congress has not charged the Commission with advancing *all* public interests, but only the public's interest in having the particular mandates of the Commission carried out, its interest, in other words, in the conservation of natural resources and the enjoyment of cheap and plentiful electricity and natural gas.

## 2. *Related Jurisdictional Issues.*

### a. *The FPC and Antitrust Considerations.*

Much is made by petitioners of our numerous holdings that the Commission may, and in some cases must, take into account the anticompetitive activities of regulatees as well as the anticompetitive effects of proposed Commission actions. *See, e. g., City of Lafayette v. SEC, supra; Northern Natural Gas Co. v. FPC,* 130 U.S.App.D.C. 220, 399 F.2d 953 (1968); *City of Pittsburgh v. FPC,* 99 U.S.App.D.C. 113, 237 F.2d 741 (1956).[41] These do not, however, establish that the content of the "public interest" criterion is generally supplied by other national policies and laws. *Some* such policies and laws are surely relevant, but not simply because they exist. They are relevant because their objectives "can be related to the objectives of the statute administered by the agency." *City of Chicago v. FPC,* 128 U.S.App.D.C. 107, 385 F.2d 629, 635 (1967). Recalling the primary objectives of the Commission as we have described them above, one would be hard put to think of a matter of more direct and proper concern to the Commission than the state of competition in the regulated industry. By doing whatever is within its power to enhance that competition, the Commission serves the same objective as it does by direct regulation of price; indeed, Commission decisions affecting the structure of the power industry could scarcely be made rationally without regard to the impact they will have on the competitive climate.

If express statutory authority to consider antitrust policies were needed, moreover, it would not be lacking. Although the Commission is nowhere empowered to enforce the antitrust laws as such,[42] it is authorized by the Natural Gas Act to transmit evidence of apparent violations of those laws to the Attorney General. 15 U.S.C. § 717s(a) (1970). The Federal Water Power Act specifies, moreover, that project licenses are to be issued by the Commission with the condition that:

> Combinations, agreements, arrangements, or understandings, express or implied, to limit the output of electrical energy, to restrain trade, or to fix, maintain, or increase prices for electrical energy or service are hereby prohibited.

16 U.S.C. § 803(h) (1970). *See also Northern Natural Gas v. FPC,* 130 U.S. App.D.C. 220, 399 F.2d 953, 959–60 (1968).

### b. *The FPC and Environmental Considerations.*

It has also been held that environmental considerations are the proper concern of the Commission. *See, e. g., Udall v. FPC,* 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967); *Scenic Hudson Preservation Conference v. FPC,* 354 F.2d 608 (2d Cir. 1965). But, as we have seen,

(1969); *City of Chicago v. FPC,* 128 U.S.App. D.C. 107, 385 F.2d 629 (1967) (agency may consider congressional objectives expressed in other legislation "assuming they can be related to the objectives of the statute administered by the agency"), *cert. denied,* 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968).

**41.** *See also Denver & Rio Grande Western R. Co. v. United States,* 387 U.S. 485, 492–493, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967); *California v. FPC,* 369 U.S. 482, 484–485, 82 S.Ct. 901, 8

L.Ed.2d 54 (1962); *United States v. Borden Co.,* 308 U.S. 188, 198–199, 60 S.Ct. 182, 84 L.Ed. 181 (1939); *Lynchburg Gas Co. v. FPC,* 119 U.S.App.D.C. 23, 336 F.2d 942, 946, 949–950 (1964); *Pennsylvania Water & Power Co. v. FPC,* 189 U.S.App.D.C. 235, 193 F.2d 230, 235 (1951), *aff'd* 343 U.S. 414, 72 S.Ct. 843, 96 L.Ed. 1042 (1952).

**42.** *Compare* 15 U.S.C. § 21(a) (1970) (enumerating other agencies empowered to enforce the Clayton Act).

the Commission's explicit mandate includes the preservation as well as the exploitation of water resources, the Water Power Act of 1920 having been "the outgrowth of a widely supported effort on the part of conservationists." *Scenic Hudson Preservation Conference v. FPC, supra* at 613. The Act itself instructs the Commission to consider the "recreational purposes" to which water resources might be put. 16 U.S.C. § 803(a) (1970). Finally, environmental considerations have been expressly made the business of all Federal agencies by the National Environmental Policy Act of 1970. *See* 42 U.S.C. § 4332(A)–(H) (1970); *Zabel v. Tabb,* 430 F.2d 199 (5th Cir. 1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971).

It is convenient at this point to mention Title VII of the Civil Rights Act of 1964 and the Equal Employment Opportunity Act of 1972,[43] counterparts of NEPA in the field of employment discrimination. In thus specifically legislating in the area of equal employment opportunity, Congress did not in our view curtail any agency's existing authority in that area, but there are several other things it did not do. It did not, in the manner of NEPA, explicitly enjoin every federal agency to concern itself with employment discrimination; to the contrary, it centralized responsibility for such matters in the Equal Employment Opportunity Commission. Strong evidence of Congress's specific desire not to diffuse authority over employment discrimination among federal agencies other than the EEOC is also found in section 604 of Title VI of the Civil Rights Act of 1964.[44] All federal agencies are directed by that Title to administer contracts and subsidies in such a way as to insure that discrimination is not practiced "under any program or activity receiving Federal Financial assistance." Section 604 provides, however, that:

Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

42 U.S.C. 2000d–3 (1970).

### c. The FCC and Employment Discrimination.

Our attention is directed to the fact that the Federal Communications Commission has adopted regulations governing the employment practices of its regulatees. *See* 47 CFR §§ 21.307, 76.311. While the validity of these regulations is not now, and appears never to have been, before us, that issue is in any case readily distinguishable from the one that is.

We have specifically recognized the responsibility of the FCC to guard against racially discriminatory programming. *Office of Communication of the United Church of Christ v. FCC,* 123 U.S.App. D.C. 328, 359 F.2d 994 (1966). The FCC has reached the conclusion that a broadcaster's programming will inevitably fail fairly to reflect the tastes and viewpoints of minorities if those minorities are systematically excluded from the broadcaster's employ.[45] This is a far different question from the one involved in the appeal before us. The FPC is expressly charged with proscribing any dis-

---

**43.** 42 U.S.C. § 2000e (1970).

**44.** 42 U.S.C. § 2000d *et seq.* (1970).

**45.** The FCC in its Memorandum Opinion and Order and Notice of Proposed Rulemaking on this matter stated in part that:

A *refusal to hire Negroes or persons of any* race or religion clearly raises a question of whether the licensee is making a good faith effort to serve his entire public. Thus, it immediately raises the question of whether he is consulting in good faith with Negro community leaders concerning programming to serve the area's needs and interests. Indeed, the very fact of discriminatory hiring policies may effectively cut the licensee off from success in such efforts.

33 F.R. 9960, 9962 (1968).

crimination, including, of course, racial discrimination, in the services that its regulatees render to the public. 15 U.S.C. §§ 717c(b) and d(a); 16 U.S.C. §§ 824d(b) and e(a) (1970).[46] But the likelihood that racial discrimination in employment might work its way into the provision of those services seems to us a slight one. More important perhaps, we would expect such service discrimination to be far more easily identified and remedied than is true of discrimination in programming, which might be so subtle and unsusceptible of direct remedy as to require the eradication of its root cause.

### d. Other Agencies and Employment Discrimination.

Petitioners cite several other instances of agency action to curb employment discrimination by regulatees. The Securities and Exchange Commission in 1971 issued a release which called attention to existing requirements that registrants disclose on appropriate SEC forms the pendency of civil rights proceedings which could affect their business activities. In thus acting, however, the SEC appears to us merely to have been fulfilling its proper role of seeing that investors are fully informed of circumstances which might bear on the financial prospects of securities-issuing corporations. A corporation's involvement in civil rights litigation may constitute such a circumstance, as may its involvement in any other kind of litigation. Indeed, the SEC release in question was only partly directed at disclosure of pending civil rights proceedings; it also called attention to the existing requirement that registrants disclose the pendency of suits against them under federal environmental protection laws. See SEC Securities Act Release No. 5170 & Exchange Act Release No. 9252 (1971).

We note also that the SEC has expressly declined to promulgate rules concerning employment discrimination by regulatees, reasoning that "[a]lthough . . . the Commission may act to assure that regulated entities do not follow practices (including employment practices) that may prove inimical to the investing public or . . . other elements of the Commission's concern," it has not been adequately shown "what the impact of such practices might be on the investing public and our capital markets." 39 Fed.Reg. 2809, 2810 (1974). See also 37 Fed.Reg. 28,767 (1972).

The Interstate Commerce Commission and Civil Aeronautics Board have each given notice of proposed rulemaking on the subject of employment discrimination by regulatees, but neither agency has taken any further action. See 36 Fed.Reg. 10,741 (1971); 37 Fed.Reg. 15,518 (1972). Of the Federal Home Loan Bank Board's regulations governing the employment practices of regulated banks, 12 C.F.R. § 528.7 (1974), it suffices for the moment to say that their validity is not an issue in this appeal.

### C. FPC Regulation of Employment Discrimination Coincidentally to Proper Commission Concerns.

 The foregoing suggests our inability to find that Congress intended for the Commission to entertain and to adjudicate individual complaints of employment discrimination by its regulatees, and to impose sanctions unrelated to the performance of its central regulatory purposes. At the same time we cannot state flatly that the Commission may never "regulate" employment discrimination, if by that it is meant that such discrimination can never figure in the Commission's regulatory calculations. We can foresee situations in which consideration by the Commission of a regulatee's discriminatory employment practices, including rules governing the invocation of that consideration, could be reasonably related to the pursuit of the Commission's proper objectives. We

---

**46.** It is to this specific statutory instruction to prohibit service discrimination by regulatees, rather than to the "public interest" standard, that the Commission points as support for its regulation of discrimination at recreational facilities at hydroelectric facilities. Br. 29; Order No. 341, 37 FPC 775 (1967).

therefore conclude that the Commission does have jurisdiction over employment discrimination in the narrower sense described at the outset of the discussion.

The Commission's task in protecting the consumer against exploitation can be alternatively described as the task of seeing that no unnecessary or illegitimate costs are passed along to that consumer. Costs incurred by reason of a regulatee's choosing to practice racial discrimination are within the reach of that responsibility. Without attempting an exhaustive enumeration of such costs, we identify at least the following as indicative of those arguably within the Commission's range of concern: (1) duplicative labor costs incurred in the form of back pay recoveries by employees who have proven that they were discriminatorily denied employment or advancement, (2) the costs of losing valuable government contracts terminated because of employment discrimination,[47] (3) the costs of legal proceedings in either of these two categories, (4) the costs of strikes, demonstrations, and boycotts aimed against regulatees because of employment discrimination, (5) excessive labor costs incurred because of the elimination from the prospective labor force of those who are discriminated against, and (6) the costs of inefficiency among minority employees demoralized by discriminatory barriers to their fair treatment or promotion.

Obviously such costs of employment discrimination range from the very definite and easily ascertainable to the very questionable and virtually unquantifiable. The problem of how to see that they are not borne by the consumer could arise in any number of different regulatory contexts, including both rate and certificate proceedings. We therefore do not attempt to detail all the various ways the Commission may thus "regulate" employment discrimination, leaving this in the first instance to the Commission itself.

A regulatee's performance in the area of equal employment opportunity may also be relevant to that company's efforts to secure a license renewal or other Commission authorization. It is conceivable that an applicant's record could be so riddled with discrimination-related legal difficulties, and its future so lacking in any promise of improvement on that score, that the Commission could validly conclude that for this reason it should not be permitted to be the recipient of franchise grants. In the long run, after all, the most efficient, lowest-cost production and distribution of electricity and natural gas will be that which is conducted in compliance with the laws, employment discrimination laws and other laws alike.

Moreover, the Commission is not necessarily confined to consideration of employment discrimination in successive adjudicatory proceedings. There are any number of matters on which it might be positively beneficial for the Commission to make rules rather than proceed on a case-by-case basis. There is the potentially quite complex question of what costs associated with employment discrimination litigation will and will not be disallowed. It is at least conceivable that a regulatee with a very poor equal employment opportunity record might be presumed to have incurred excess labor costs because of its exclusionary practices and that these costs, being difficult to quantify and prove, will be rebuttably presumed to equal a certain percentage of actual labor costs.

The line is always to be drawn between regulation reasonably related to the Commission's central functions, and regulation of employment discrimination for its own sake. The line may well be difficult to draw on occasion, but it is the business of agencies—and of courts—to do so.

D. *The Commission's Constitutional Obligations.*

Petitioners' claim founded on the Constitution is that it not only empowers

---

47. *See* Exec. Order No. 11,246 3 C.F.R. 169 (1974) (all contracts with federal government to include private contractor's promise not to discriminate in employment; contracting government agencies to cancel for breach of such promise).

but also requires the Commission to proscribe employment discrimination by regulatees. This is because the actions of the regulated companies are assertedly "state action" and therefore subject to the Fifth Amendment's prohibition of racial discrimination. Three circumstances are relied on as establishing the necessary intertwining of government with private entity which results in the latter's conduct being considered "state action." These are (1) the otherwise comprehensive extent of federal regulation of the FPC regulatees; (2) the enjoyment by the companies of what amounts to a government-granted monopoly; and (3) their performance of a governmental function in the production and transmission of energy. The Commission meets the "state action" claim by denying that the government is "significantly involved" with the regulated companies.[48] In our view, however, the question that is most immediately relevant to the powers and duties of the Commission to regulate employment discrimination is not the familiar one of "state action" *vel non,* but the distinct, if seldom isolated,

issue of what the consequences may be of a finding of "state action."

The most familiar, and perhaps also the most natural, consequence of the erasure of the distinction between government and private entity is that the constitutional obligations of the government—not to discriminate on racial grounds, not to infringe freedom of speech, etc.—devolve as well upon the ostensibly private entity and are enforceable against it.[49] It is possible, however, that the existence of the "state action" relationship also imposes some new obligation on the government. If the persistence of such a relationship between the government and one practicing racial discrimination constitutes an ongoing constitutional violation, for example, perhaps the government incurs an obligation to terminate the relationship.[50] This like other obligations of the government would be enforceable in a court of law, and, if it had not already been so enforced, would presumably be a ground for objecting in proceedings before the Commission to license renewals and the like.

**48.** We note that the Supreme Court recently held in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), that the termination of service by a state-regulated electric utility did not constitute "state action" subject to the Fourteenth Amendment's due process clause. For the reason stated in text, however, we do not undertake the sifting of particular facts and circumstances necessary to say whether the same is true of the employment practices of the various kinds of Commission regulatees, among them some that are actually situated "upon . . . the public lands and reservations of the United States." 16 U.S.C. § 797(e) (1970). *Cf. Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

**49.** *See, e. g., Evans v. Newton,* 382 U.S. 296, 302, 86 S.Ct. 486, 490, 15 L.Ed.2d 373 (1966) ("public character" of recreation facility required that it be "treated as a public institution subject to the command of the Fourteenth Amendment"); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (lessee of state property must comply with proscriptions of Fourteenth Amendment); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (exclusion of Negroes by county political organization

held unconstitutional); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (exclusion of Negroes by state political party held unconstitutional); *Simkins v. Moses H. Cone Memorial Hospital,* 323 F.2d 959 (4th Cir. 1963) (federally funded hospital may not discriminate on racial grounds).

**50.** *See, e. g., McGlotten v. Connally,* 338 F.Supp. 448 (D.D.C.1972) (Treasury Secretary enjoined from extending tax benefits to private clubs and fraternal orders that excluded Negroes); *Green v. Connally,* 330 F.Supp. 1150, 1164–65 (D.D.C.1971), *aff'd sub nom. Green v. Colt,* 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971) (federal government permanently enjoined from extending tax benefits to racially segregated private schools); *Green v. Kennedy,* 309 F.Supp. 1127 (D.D.C.1970) (preliminary injunction in same case); *Irvis v. Scott,* 318 F.Supp. 1246 (M.D.Pa.1970) (state liquor license of fraternal order that excluded Negroes held invalid), *rev'd sub nom. Moose Lodge No. 407 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Ethridge v. Rhodes,* 268 F.Supp. 83 (S.D.Ohio 1967) (state enjoined from entering construction contracts with private parties practicing employment discrimination).

But the petitioners urge on us a third possible consequence of the "state action" relationship, namely, that while that relationship lasts the government must affirmatively regulate its private partner to insure that the latter discharges the constitutional obligations devolving upon it because of the relationship. Precedent for an agency's being constitutionally required to detail the constitutional obligations of its regulatees is very limited, however. In *Business Executives Move for Vietnam Peace v. FCC*, 146 U.S.App.D.C. 181, 450 F.2d 642 (1971), a division of this court, with one judge dissenting, held that the Constitution prohibited regulated broadcasters from rejecting all controversial advertising, and the FCC was commanded to develop "reasonable regulatory guidelines" to carry out this constitutional command. *Id.* at 665.[51] That decision was, however, reversed by the Supreme Court *sub nom. Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). The notion of constitutionally requiring the FCC to regulate in a certain way was the specific subject of considerable criticism by the Court, *id.* at 125–27, 93 S.Ct. 2080, though it no doubt was concerned with the problem that regulation of broadcasters under the authority of the First Amendment would itself raise First Amendment problems.

Moreover, a requirement of affirmance regulation would raise many problems. Which of the various constitutional commands addressed in the first instance to the government must the government reinterpret for its private collaborators, and what degree of specificity is required? If, as we have found to be true in the case before us, an agency lacks the statutory power to "regulate" in this way, does the Constitution itself piggyback such power onto the statutory powers whose exercise gave rise to the state-action relationship? No such problem exists where the private entity is directly subject to the legislature without the intercession of an agency, but the proposition then becomes a truly anomalous one, namely, that the Constitution compels the legislature affirmatively to legislate in a certain way.

## III

In the light of what has been said above, the position taken by each side appears to be partially right and partially wrong. Insofar as petitioners maintain that the Commission is not completely without jurisdiction to consider, and indeed to write regulations concerning, employment discrimination by its regulatees, they appear to be correct. It is also clear, however, that they have proposed a rule which, at least in certain of its provisions, is well beyond the Commission's power to adopt. Section 9, for example, imposing on the Commission the duty to entertain and to act upon individual discrimination complaints, seems to us not reasonably related to the furtherance of the Commission's proper objectives. The hearing and adjudication of individual complaints would be an inordinately time-consuming process in view of the very slight impact it might have on the efficient operation of the regulated industries. On the other hand, those sections providing for the annual filing with the Commission of a form already due the EEOC (section 6), and for intervention and receipt of evidence in Commission proceedings (sections 10 and 11), might well be viewed as orderly methods of bringing to the Commission's attention information which could be relevant to its deliberations in

---

51. *See also Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961) ("By its inaction, . . . the State, has . . . made itself a party to the refusal of service . . . .) (dictum); *Public Utilities Commission v. Pollak*, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952) (where challenge made to government's allowance of allegedly unconstitutional conduct of regulatees, the Court found it "appropriate to examine into what restriction . . . the First and Fifth Amendments place upon the Federal Government") (dictum).

the ways described in Part II of this opinion.

We do not attempt a section-by-section appraisal of the rules at this time. That would be inappropriate on this record, and in the absence of prior Commission consideration in rule making by reference to the statutory boundaries to its authority demarcated hereinabove.

Turning briefly to constitutional considerations, we doubt for reasons already stated that the Commission is required to enforce the constitutional obligations of its regulatees by affirmative regulations. The Commission does not appear to have refused *all* affirmative regulation, however. In this context the confusion over this point in the record, along with our practice of not deciding constitutional questions unnecessarily, persuades us not to pursue the matter any further, except to say that, however we might resolve our difficulties with the proposition that the Commission is constitutionally required to adopt *some* anti-discrimination rule, we are very sure that it is not required to adopt *this* one. Constitutional obligations are occasionally translated by the courts into terms as detailed, specific, and far removed from the constitutional language as are the terms of this rule. *See, e. g., Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v. Frazer,* 317 F.Supp. 1079 (M.D. Ala.1970). This is done only occasionally, however, and after some experience has shown the need of such strict prophylaxis. In any case, it is not the courts but the Federal Power Commission which must particularize any constitutional obligation that may exist, and this task should certainly be left in the first instance to the Commission.[52]

If the petitioners have been extravagant in their claims, however, the Commission has been miserly in its response. The request for the adoption of the proposed rule may have been excessive, but it is not at all clear that the Commission was free to consider that this was the only request made. It was not in any event free to deny even that request for the reason (if it was its reason) that it had no authority whatsoever to promulgate any rules relating to employment discrimination.

The result for the purposes of the disposition of this review proceeding is that the important jurisdictional questions inherent in it have not been framed in a meaningful way. The parties themselves have blunted and obscured their extreme positions to the point of retreat, although one that cannot in either case be exactly measured. Not wishing to be understood either to imply by a reversal that the petitioners' proposed rule could be adopted as is, or to endorse by an affirmance the Commission's broad disavowal of any jurisdiction over racial discrimination by its regulatees, we have concluded that the wisest course is to vacate the Commission's order and remand for further proceedings consistent with this opinion.[53]

*It is so ordered.*

---

52. Even in *Business Executives Move for Vietnam Peace, supra* note 67, this court chose to "leave the Commission and licensee broad latitude to develop 'reasonable regulations.'" 450 F.2d at 663.

53. We have concerned ourselves herein only with the Commission's jurisdiction—with its power to adopt rules relating to employment discrimination. Nothing has been said of the Commission's considerable discretion, in common with other agencies, not to promulgate rules even when it has the authority to do so.

The Commission might well determine that rule making in the area of employment discrimination, though permissible, should be deferred at least temporarily in favor of the information and experience to be gained from case-by-case consideration of such matters as they arise in normal rate making and licensing proceedings. Since the Commission did not purport to exercise such discretion in this case, the question of whether it could validly do so is not before us.

APPENDIX

Before the

FEDERAL POWER COMMISSION

Docket No. R–447

EQUAL EMPLOYMENT OPPORTUNITY IN THE ELECTRIC AND GAS UTILITY INDUSTRY

PROPOSED RULE

Section 1. *Definitions.* As used in this rule: (1) "Commission" means the Federal Power Commission; (2) "licensee" means any person, State or municipality licensed under the provisions of section 4 of the Federal Power Act, and any assignee or successor in interest thereof; (3) "natural gas company" means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale; (4) "person" includes an individual or a corporation; (5) "public utility" means any person who owns or operates facilities subject to the jurisdiction of the Commission under Parts II or III of the Federal Power Act, and (6) "regulatee" means any licensee, natural gas company or public utility.

Sec. 2. *Policy.* The Commission finds and declares that: (1) Equal employment opportunity for all persons regardless of race, color, religion, sex or national origin is a national policy; (2) the furtherance of that national policy is a matter of the public interest, and (3) it shall, in each determination under the Federal Power Act or the Natural Gas Act with respect to the public interest, give material consideration to such national policy.

Sec. 3. *Unlawful Employment Practices.* No regulatee shall (1) fail or refuse to hire or discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin; (2) limit, segregate or classify its employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin; (3) discriminate in admission to, or employment in, any program of apprenticeship, training or retraining, including on-the-job training, on account of an individual's race, color, religion, sex or national origin; (4) discriminate against any employee or applicant for employment because such employee or applicant has opposed any employment practice made unlawful by Federal, State or local law or regulation or because he has in good faith made a charge of such practice or testified, assisted or participated in any manner in an investigation, proceeding or hearing of such practice by any lawfully constituted authority, or (5) print or publish or cause to be printed or published any notice or advertisement relating to employment by such regulatee, indicating any preference, limitation, specification or discrimination based on race, color, religion, sex or national origin, except where a preference or specification is for the purpose of remedying past practices of discrimination.

Sec. 4. *Equal Employment Opportunity Programs. Duties of Management.* Each regulatee shall establish, maintain, carry out and file with the Commission a written equal employment opportunity program, in which the regulatee shall commit itself to each of the following courses of action: (1) Define the responsibility of each level of management to insure a positive application and vigorous enforcement of the policy of equal employment opportunity, and establish a procedure to review and control managerial and supervisory performance; (2) inform its employees and recognized employee organizations of the positive equal employment opportunity policy and program and secure their cooperation; (3) communicate the equal employment opportunity policy and program and its employment needs to sources of qualified applicants without regard to race, color, religion, sex, or national origin, and solicit their recruitment assistance on a

continuing basis; (4) conduct a continuing campaign to exclude every form of prejudice or discrimination based on race, color, religion, sex or national origin from its personnel policies and practices and working conditions, and (5) conduct continuing reviews of job structure and employment practices and adopt positive recruitment, training, job design and other measures needed in order to insure genuine equality of opportunity to participate fully in all organizational units, occupations and levels of responsibility.

Sec. 5. *Equal Employment Opportunity Programs. Substantive Content.* Each regulatee shall include in its equal employment opportunity program such specific practices as the following:

(1) To assure nondiscrimination in recruiting: (a) Posting notices in the regulatee's employment offices informing applicants of their equal employment rights and their right to notify the Federal Power Commission or other appropriate agency if they believe they have been the victim of discrimination; (b) Planning a notice in bold type on the employment application informing prospective employees that discrimination on account of race, color, religion, sex, or national origin is prohibited and they may notify the Federal Power Commission or other appropriate agency if they believe they have been discriminated against; (c) placing employment advertisements in media which have significant circulation among minority groups and females in the recruiting area; (d) recruiting through schools and colleges with significant minority group and female enrollments; (e) maintaining systematic contacts with minority, human relations and female organizations, leaders and spokesmen to encourage referral of qualified minority and female applicants; (f) encouraging present employees to refer minority and female applicants, and (g) making known to all recruitment sources that qualified minority and female persons are being sought whenever the company hires.

(2) To assure nondiscrimination in selection and hiring: (a) Instructing those of the regulatee's staff who make hiring decisions that all applicants for all jobs are to be considered without discrimination; (b) cooperating with unions in the development of programs to assure qualified minority and female personnel equal opportunity for employment and including an effective nondiscrimination clause in new or renegotiated union agreements, and (c) avoiding the use of selection techniques or tests which have the effect of discrimination against minority groups or females.

(3) To assure nondiscrimination in placement and promotion: (a) Instructing those of the regulatee's staff who make decisions on placement and promotions that minority and female employees are to be considered without discrimination, and that job areas in which there is little or no minority or female representation should be reviewed to determine whether this results from discrimination; (b) giving all employees equal opportunity for positions which lead to higher positions, and inquiring as to the interests and skills of all lower paid employees with respect to any of the higher paid positions, followed by assistance, counseling, and effective measures to enable employees with interest and potential to qualify themselves for such positions, and (c) reviewing seniority practices and seniority clauses in union contracts to insure that such practices or clauses are not discriminatory and do not have a discriminatory effect.

(4) To assure nondiscrimination in other areas of employment practices: (a) Examining rate of pay and fringe benefits for present employees with equivalent duties, and adjusting any inequities found, and (b) advising all qualified employees whenever there is an opportunity to perform overtime work.

Sec. 6. *Annual Employment Reports.* Each regulatee shall, contemporaneously with the filing of its EEO–1 form with the United States Equal Employment Opportunity Commission, file a copy thereof with the Commission.

Sec. 7. *Applicants to furnish equal employment information.* Each applicant for a license, renewal thereof, certificate of public convenience and necessity, rate change, permission to abandon a facility, permission to sell, lease or dispose of a facility, permission to merge facilities or any other permission or authorization in which the Commission is charged by law with protecting the public interest, shall include with its application (1) a report indicating the manner in which the specific practices undertaken pursuant to the regulatee's equal employment opportunity program have been applied and the effect of these practices upon the applications for employment, hiring and promotions of minority group members and females; (2) a report indicating whether any complaint has been filed before any body having competent jurisdiction under Federal, State, territorial or local law, alleging unlawful discrimination in the employment practices of the applicant, including the persons involved, the date of filing, the court or agency before which the matter is or has been, the file number (if any), and the disposition or current status of the matter, and (3) a copy of the regulatee's last current EEO–1 form.

Sec. 8. *Affirmative Action Plans satisfactory.* In the case of any regulatee which is required to file an affirmative action plan with the Office of Federal Contract Compliance of the United States Department of Labor or any other Federal agency, a copy of such plan may be filed in lieu of the program required under the provisions of sections 4 and 5 of this rule.

Sec. 9. *Complaints of discrimination.* Any person who believes himself or any specific class of individuals to be subjected to discrimination prohibited by this rule may, by himself or by a representative, file a complaint with the Commission. The provisions of Part I of Subchapter A of Chapter I of Title 18 of the Code of Federal Regulations with respect to the processing of complaints, the conduct of hearings and the issuance of

decisions and orders shall apply to complaints filed under this section.

Sec. 10. *Intervention.* Any person who believes himself or any specific class of individuals to be subjected to discrimination prohibited by this rule may, in accordance with the provisions of section 1.8 of Part I of Subchapter A of Chapter I of Title 18 of the Code of Federal Regulations, participate in any proceeding involving applications for such authorizations or permissions as the Commission may give under statutory or other delegated authority administered by it.

Sec. 11. *Consideration of equal employment information in making public interest determinations and sanctions.* In each proceeding in which the Commission is charged by law with protecting the public interest, including but not limited to applications for licenses, certificates of public convenience or necessity, rate changes, permission to abandon facilities, permission to sell, lease or dispose of facilities and permission to merge facilities, the Commission shall give material consideration to the information required to be provided under the provisions of sections 4, 5, 6 and 7 of this rule, and may deny, delay or condition any such license, certificate, rate change, or permission in accordance with such consideration.

Sec. 12. *Referrals and Deferrals to EEOC.* The Commission may refer any complaint involving a probable violation of any provision of Title VII of the Civil Rights Act of 1964, as amended, to the Equal Employment Opportunity Commission. If duplicate complaints are filed both with the Commission and with the Equal Opportunity Commission, the Commission shall defer jurisdiction and the Equal Employment Opportunity Commission will process the complaint.

Sec. 13. *Proceedings in forma pauperis.* The Commission shall, upon the filing of an affidavit of indigency by any complainant or intervener, provided reasonable counsel fees and copies of transcripts of hearings without charge.

Sec. 14. *Penalties.* The penalties prescribed for violations of the regulations

or orders of the Commission under the provisions of section 21 of the Natural Gas Act and section 316 of the Federal Power Act shall apply to violations of this rule or of orders of the Commission issued pursuant thereto.

Sec. 15. *Court Review of Orders.* Any party aggrieved by an order of the Commission issued pursuant to this rule may apply for rehearing and court review of such order in accordance with the provisions of section 19 of the Natural Gas Act of section 313 of the Federal Power Act.