**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiffs,**

v.

**SECURITIES AND EXCHANGE COMMISSION et al., Defendants.**

**Civ. A. No. 409–73.**

United States District Court, District of Columbia.

May 19, 1977.

---

Roger S. Foster, Lois J. Schiffer, Center for Law and Social Policy, J. G. Speth, Edward L. Strohbehn, Jr., Natural Resources Defense Council, Inc., Collot Guerard, Media Access Project, Washington, D. C., for plaintiffs.

Harvey L. Pitt, Irving H. Picard, Daniel L. Goelzer, S. E. C., Washington, D. C., for defendants.

James van R. Springer, Washington, D. C., for amicus curiae, American Civil Liberties Union.

Daniel R. Ferry, Washington, D. C., for amicus curiae, Southeast Legal Foundation.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### I. INTRODUCTION

On December 9, 1974, this Court held that the Securities and Exchange Commission

(SEC) had failed to comply with the procedural requirements of section 4 of the Administrative Procedure Act, 5 U.S.C. § 553 (1970), in adopting rules intended to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 *et seq.* (1970), and in denying the portions of plaintiffs' rulemaking petition that sought disclosure of equal employment opportunity information.[1] Accordingly, the Court remanded the case to the Commission with directions (1) "to undertake further rulemaking action to bring the Commission's corporate disclosure regulations into full compliance with the letter and spirit of NEPA,"[2] and (2) to reconsider fully the denial of the equal employment portion of plaintiffs' rulemaking petition.[3]

As described more fully herein, the SEC has now completed the further rulemaking proceedings required by this Court's remand order and, after reconsideration in light of substantial public input, it has determined *not* to impose disclosure requirements in addition to those presently extant.[4] Plaintiffs admit that the scope and conduct of the Commission's rulemaking proceeding satisfy the procedural requirements of the APA and that the Commission's statement of reasons for its rulemaking actions is adequate to permit judicial review. They now seek, pursuant to 5 U.S.C. §§ 701–06, judicial review of the Commission's final decision not to require additional disclosures. This case is now, therefore, before the Court on cross motions for summary judgment on the issue of whether the SEC's final determinations were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Ethyl Corp. v. EPA,* 176 U.S. App.D.C. 373, 541 F.2d 1 (en banc), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

For the reasons hereinafter set forth, the Court rejects plaintiffs' argument that NEPA requires the Commission to impose additional environmental disclosure requirements on registrants and that the Commission's decision not to impose such additional disclosure requirements was therefore "not in accordance with law." Notwithstanding this conclusion, however, the Court concludes that NEPA requires the Commission to give serious consideration in its decisionmaking to environmental factors, and requires that the Commission neither strike an arbitrary balance of costs and benefits nor give clearly insufficient weight to environmental values in its decisionmaking. Upon review of the Commission's decision not to impose such additional environmental disclosure requirements, the Court concludes that this decision was the product of a decisionmaking process marred by serious and fundamental defects and that the Commission's rejection of certain specific disclosure alternatives was not rationally based and is not sustainable on the present administrative record. Thus, the Court concludes that the Commission's decision not to require additional environmental disclosures was "arbitrary and capricious." Finally, the Court also concludes that the Commission's decision not to impose any disclosure requirement for equal employment opportunity information was not rationally based and is not sustainable on the present administrative record, and therefore the Court concludes that this decision was also "arbitrary and capricious." Accordingly, the Court will grant plaintiffs' motion for summary judgment insofar as it seeks a declaratory judgment that the Commission's decision not to require registrants to disclose equal employment opportunity information and additional environmental information

---

1. *Natural Resources Defense Council, Inc. v. Securities and Exchange Commission,* 389 F.Supp. 689 (D.D.C.1974).

2. *Id.* at 693.

3. *Id.* at 702. This part of the rulemaking petition sought disclosure of employment statistics

and legal proceedings involving Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq., as amended,* and Executive Order 11246. *See* section V, *infra.*

4. *See* Section IV, *infra.*

was arbitrary and capricious, and the Court will remand this case to the Commission and require it to reconsider these matters in accordance with this opinion.

## II. FACTUAL BACKGROUND [5]

Pursuant to the Court's remand order, the SEC, on February 11, 1975, announced a proceeding to consider further rulemaking.[6] Public hearings commenced on April 14, 1975, and were held on 19 separate days with the last hearing on May 14, 1975. During this time the Commission received 54 oral representations. In addition, during April and May of 1975, the Commission received 353 written comments. On October 14, 1975, the Commission announced "its conclusion and proposals for further rulemaking . . . concerning possible disclosure in registration statements, reports and other documents filed with the Commission or required to be furnished to investors pursuant to the Securities Act of 1933 and the Securities and Exchange Act of 1934 of environmental and other matters of social concern, including equal employment matters." [7] It proposed for comment "rules which would make available to interested investors information regarding the extent to which corporations have failed to satisfy environmental standards under federal law." [8] The Commission determined, however, that it would not be appropriate to propose either alternative environmental disclosure requirements or specific disclosure requirements regarding corporate equal employment and other practices.[9]

The Commission received approximately 210 letters of comment concerning its proposed rules on disclosure of instances of corporate noncompliance with federal environmental laws. On the basis of these comments, and after extended consideration, the Commission announced on May 6, 1976, that it had concluded *not* to adopt its rulemaking proposal on the disclosure of information regarding the extent of corporate noncompliance with federal environmental standards.[10]

## III. STATUTORY BACKGROUND

The provisions of the securities laws that establish the SEC's authority to conduct the instant rulemaking proceedings are as follows: Sections 7 and 10 of the Securities Act, 15 U.S.C. §§ 77g, 77j, prescribe certain types of information that must be disclosed in registration statements and prospectuses, respectively. In addition, they authorize the Commission to require the disclosure of such other information as it "may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. §§ 77g, 77j(c). Similarly, section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a), authorizes the Commission to require disclosure in connection with proxy solicitations "as necessary or appropriate in the public interest or for the protection of investors." In addition, sections 19(a) of the Securities Act and 23(a) of the Securities Exchange Act, 15 U.S.C. §§ 77s(a), 78w(a), vest in the Commission general authority to promulgate such rules and regulations "as may be necessary" in administering the securities laws.[11]

---

5. The Court's Memorandum Opinion of December 1974 should be consulted for an explanation of the factual background of this case prior to the rulemaking proceedings conducted in accordance with this Court's remand order. *See* 389 F.Supp. 693–95.

6. Securities Act Release No. 5569, 40 Fed.Reg. 7013 (1975).

7. Securities Act Release No. 5627, 40 Fed.Reg. 51,656 (1975).

8. 40 Fed.Reg. at 51,657. *See* text at note 31 *infra*.

9. 40 Fed.Reg. at 51,657.

10. Securities Act Release No. 5704, 41 Fed.Reg. 21,632 (1976).

11. Other statutory sections giving the Commission specific rulemaking authority include: section 12(b) of the Securities Exchange Act, 15 U.S.C. § 78*l*(b) [authority to require applications for registration of securities to include such information respecting the issuer's organization, financial structure, nature of business, and financial statements as the Commission deems "necessary or appropriate in the public interest or for the protection of investors"];

## IV. THE ENVIRONMENTAL ASPECTS OF THE COMMISSION'S RULEMAKING PROCEEDING

At the time of the rulemaking proceeding, the SEC's existing disclosure rules required registrants to disclose three "categories" of environmental information. First, the general requirement of disclosure of "material" information, information "which an average prudent investor ought reasonably to be informed" about,[12] required the disclosure of the "material" effects that compliance with federal, state, and local environmental laws may have on capital expenditures, earnings, and competitive position.

Second, a specific rule required the disclosure of all litigation, commenced or known to be contemplated, against a registrant by a governmental authority pursuant to federal, state, or local environmental laws.[13]

Finally, the existing rules required the disclosure of all additional "material" information necessary to make the registrant's statements in required filings neither false nor misleading.[14] Despite its consideration of various additional disclosure requirements for environmental information, the Commission decided not to adopt any new disclosure requirements.[15] It stated its be-

---

section 13(a) of the Securities Exchange Act, 15 U.S.C. § 78m(a) [authority to require issuers of registered stock to keep current the information in the application or registration statement and to file periodic reports containing such information as the Commission deems "necessary or appropriate for the proper protection of investors and to insure fair trading in the security."]

**12.** *See* Securities Act Release No. 5386, 38 Fed. Reg. 12,100 (1973). For the definition of "material," see 17 C.F.R. §§ 210.1–02(n), 230.405(*1*), 240.12b–2(j).

An example of the application of the existing rules to the disclosure of environmental information is provided by the recent complaint filed by the Commission in *SEC v. Allied Chemical Corp.,* Civil Action No. 77–373 (D.D.C. filed March 4, 1977). In that complaint, the Commission alleged that Allied omitted "to state in public announcements and in filings with the Commission that Allied was subject to material potential financial exposure resulting, in part, from directly and indirectly discharging toxic chemicals into the environment [specifically, discharging Kepone into the James River in Virginia] from its own facilities and from the facilities of others." Complaint ¶ 7. The complaint charged that by omitting such disclosure, Allied had violated section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, and section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 13a–1, 13a–11, and 13a–13, 17 C.F.R. §§ 240.-13a–1, 240.13a–11, 240.13a–13. Without admitting or denying the allegations in the complaint, Allied consented to a permanent injunction restraining it from "making or disseminating false or misleading financial statements, reports and other material information concerning, among other things, Allied's potential material financial exposure resulting from its pollution activities."

**13.** *See* 38 Fed.Reg. at 12,101–02. Thus, Item 12 of Form S–1 and Item 10 of Form 10 were amended in 1973 to state that "administrative or judicial proceedings arising under any Federal, State or local provisions which have been enacted or adopted regulating the discharge of materials into the environment or otherwise relating to the protection of the environment, shall not be deemed 'ordinary routine litigation incidental to business' and shall be described if such proceeding is material to the business or financial condition of the registrant or if it involves primarily a claim for damages and the amount involved, exclusive of interest and costs, exceeds 10 per cent of the current assets of the registrant and its subsidiaries on a consolidated basis. Any such proceedings by governmental authorities shall be deemed material and shall be described . . .; provided, however, that such proceedings which are similar in nature may be grouped and described generically . . . ." Significantly, in adopting this amendment to its forms, the Commission specifically rejected requiring registrants to describe generally any environmentally-related judicial or administrative proceeding brought by a governmental authority; instead, the Commission permitted "generic descriptions" of such proceedings because it felt that the more comprehensive descriptions would be "excessively detailed without commensurate benefit to average investors." 38 Fed.Reg. at 12,101. The Commission did not explicate the basis for this conclusion.

**14.** *See* 17 C.F.R. §§ 210.3–06, 230.408, 240.12b–20, 240.14a–3(b)(2), 240.14a–9(a), 240.14c–6.

**15.** The SEC did adopt a rule concerning the disclosure of "material" capital expenditures for environmental purposes. *See* Securities Act Release No. 5704, 41 Fed.Reg. 21,632 (1976). However, the Commission itself viewed this as a mere clarification of its pre-existing disclosure requirement to ensure uniformity in reporting. *See* Securities Act Re-

lief that the existing disclosure requirements "will elicit the type of environmental information in which investors appear to be interested and are more than sufficient to discharge the Commission's NEPA obligations."[16]

█ Plaintiffs challenge the Commission's decision not to compel additional corporate disclosures of environmental information on two grounds.[17] First, they assert that "NEPA imposes on the Commission a mandatory obligation to develop a substantial program of corporate disclosure that will advance the act's objectives"[18]: Plaintiffs take the position that NEPA *requires* the SEC to compel substantial corporate disclosures which will (1) deter corporate activities that adversely affect the environment, and (2) provide investors with necessary information to make "environmentally responsible" investment and voting decisions.[19] Second, plaintiffs argue that even if NEPA does not mandate substantial additional disclosures, the Commission's decision not to exercise its authority to compel such disclosures "in the public interest or

for the protection of investors" was arbitrary and capricious.

*A. NEPA Does Not Mandate That The Commission Require Additional Corporate Disclosure Of Environmental Information.*

█ It is necessary for the Court to consider first plaintiffs' argument that NEPA mandates that the Commission promulgate broad environmental disclosure regulations, for if plaintiffs' reading of NEPA is correct, the existing environmental disclosure regulations are certainly "not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs base their "mandatory" argument on two grounds. First, they assert that an SEC requirement that corporations disclose substantial information concerning their activities that have an adverse impact on the environment would have a significant deterrent effect on such activities with the result that the quality of the environment would ultimately be improved.[20] Plaintiffs premise this argument

lease No. 5627, 40 Fed.Reg. 51,656, 51,663 (1975).

**16.** 41 Fed.Reg. at 21,635.

**17.** Defendants have urged the Court to dismiss this case without reviewing the Commission's decision not to promulgate additional disclosure regulations. They contend that none of the plaintiffs herein has standing to seek such judicial review. There are now seven plaintiffs in this action. Plaintiffs Natural Resources Defense Counsel, Project on Corporate Responsibility, Inc., and Center for Corporate Responsibility, Inc., were the original plaintiffs in this action. Four additional plaintiffs were permitted by Order of this Court on September 1, 1976, to join as parties plaintiff: They are the National Organization for Women, the Unitarian Universalist Association, the American Baptist Home Mission Society, and the Province of St. Joseph of the Capuchin Order.

In its 1974 Memorandum Opinion, this Court held that the three original plaintiffs all had standing to maintain this action. Defendants contend, however, that the Supreme Court's holdings in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), undermine the reasoning underlying this Court's initial holding on plaintiffs' standing.

The Court concludes that both with regard to the original plaintiffs and with regard to the new plaintiffs, their alleged injuries to their "informational interests" as investors under the securities laws (or, in the case of the National Organization for Women, which is suing as a representative of its members, its members' informational interest as investors) and/or as users of environmental information under NEPA, *see Scientists' Institute for Public Information, Inc. v. AEC,* 156 U.S.App.D.C. 395, 481 F.2d 1079, 1087 n. 29 (1973), are sufficient to establish their standing to bring this action. Nothing in either *Warth* or *Simon* or in any other pertinent authorities vitiates this Court's initial conclusion on this issue. *Natural Resources Defense Council, Inc. v. Securities Exchange Commission,* 389 F.Supp. at 697–98.

**18.** Plaintiffs' Memorandum of January 11, 1977, at 2.

**19.** Plaintiffs' Memorandum of July 16, 1976, at 35.

**20.** Plaintiffs' "disclosure-as-deterrent" argument derives from the philosophy of Mr. Justice Brandeis who said:

Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is

primarily on sections 101(b)(3) and 102(1) of NEPA, 42 U.S.C. §§ 4331(b)(3), 4332(1), which they contend establish a substantive mandate of environmental protection for all federal agencies. Second, plaintiffs assert that corporate disclosure would provide significant environmental information to investors and the public that is not presently available in any meaningful form. Therefore, they argue, section 102(2)(F), 42 U.S.C. § 4332(2)(F), requires the Commission to exercise its authority to generate and make available such information.

The Court has reviewed the language of the three NEPA provisions relied on by plaintiffs, the pertinent legislative history, and the relatively few cases that have discussed the "substantive mandate" of these provisions, and the Court concludes that none of these provisions *mandates* that the Commission must impose substantial environmental disclosure requirements on registrants as plaintiffs contend. As the Court of Appeals for the District of Columbia Circuit said in the seminal NEPA case of *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission,* (hereinafter, *Calvert Cliffs'*), 146 U.S.App.D.C. 33, 449 F.2d 1109, 1112 (1971): "Congress did not establish environmental protection as an exclusive goal . . . . [T]he general substantive policy of the Act is a flexible one. It leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances." The Court of Appeals for this Circuit recently reiterated this conclusion: ". . . NEPA does not guarantee a particular outcome on the merits; rather, the statute mandates only a 'careful and informed deci-

sionmaking process' to enlighten the decisionmaker and the public." *Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission,* 547 F.2d 633, 654 (D.C.Cir. 1976), *cert. granted,* 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1977). Thus, it appears well settled that the decision to take or not to take particular action is "broadly committed" to the agency's discretion. *Environmental Defense Fund, Inc. v. Corps of Engineers (Tennessee-Tombigbee),* 492 F.2d 1123, 1139 n. 33 (5th Cir. 1974).

*B. NEPA Does Mandate That The Commission, "To The Fullest Extent Possible," Consider Seriously "Alternatives To Its Actions Which Would Reduce Environmental Damage," And NEPA Further Mandates That The Commission Not Strike An Arbitrary Balance Of Costs And Benefits Nor Give Clearly Insufficient Weight To Environmental Values.*

While neither section 101(b)(3), section 102(1), nor section 102(2)(F) of NEPA requires the Commission to impose additional environmental disclosure requirements on registrants, section 102(2)(1) does require the Commission "to give full *consideration* to environmental protection": It "requires that an agency must—to the *fullest* extent possible under its statutory obligations—consider alternatives to its actions which would reduce environmental damage." *Calvert Cliffs',* 449 F.2d at 1128. As the Supreme Court recently stated in *Flint Ridge Development Co. v. Scenic Rivers Association,* 426 U.S. 776, 787, 96 S.Ct. 2430, 2437, 49 L.Ed.2d 205 (1976), the section 102 phrase "to the fullest extent possible" is

said to be the best of disinfectants; electric light is the most efficient policeman. . . . Brandeis, *Other People's Money* 92 (1932 ed.). *See* Securities and Exchange Commission, Disclosure to Investors, A Reappraisal of Administrative Policy Under the 1933 and 1934 Acts (1969) ("[A]ppropriate publicity tends to deter questionable practices and to elevate standards of business conduct.")

The appositeness of this philosophy to the disclosure of information concerning corporate activities having an adverse impact on the environment was advocated by two SEC attorneys

in a 1971 law review article. Sonde & Pitt, *Utilizing the Federal Securities Laws to "Clear the Air! Clean the Sky! Wash the Wind!",* 16 Howard L.J. 831, 850 (1971). Paraphrasing then Professor Frankfurter's statement in *The Securities Act: Social Consequences,* Fortune, August 1933, at 55, the authors said: "There is a shrinking quality to activities which tend to destroy or adversely affect the environment; to force the knowledge of them into the open is largely to restrain their happening. Many practices safely pursued in private lose their justification in public."

neither accidental nor hyperbolic. Rather, [it] is a deliberate command that the duty NEPA imposes upon the agencies to *consider* environmental factors not be shunted aside in the bureaucratic shuffle.

Moreover, it is clear that while, as indicated above, an agency's decision to take or not to take particular action is "broadly committed" to the agency's discretion, the agency's decision should not be sustained by a reviewing court if that decision was based on an arbitrary balance of costs and benefits or if the agency "clearly gave insufficient weight to environmental values." *Calvert Cliffs'*, 449 F.2d at 1115; *Sierra Club v. Morton,* 169 U.S.App.D.C. 20, 514 F.2d 856, 874 & n. 25 (1975), *rev'd on other grounds sub nom., Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); *Environmental Defense Fund, Inc. v. Corps of Engineers* (Gillham Dam), 470 F.2d 289, 300 (8th Cir. 1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973).

C. *The Commission's Decision To Reject Various Environmental Disclosure Alternatives Was Not Based On A Consideration Of Relevant Factors, Was Not Rational, And Was In Violation Of NEPA's Procedural Mandate, And Therefore Its Decision Was "Arbitrary And Capricious."*

(1) *The "Arbitrary and Capricious" Standard of Review.*

■ With the above-articulated considerations in mind, it is necessary to consider plaintiffs' argument that the Commission's decision not to require corporations to make additional disclosures was arbitrary and capricious. Before engaging in actual review of the Commission's rulemaking proceeding and the basis for its final determination, however, it is important, as the Court of Appeals for this Circuit recently said in its *en banc* decision in *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 541 F.2d 1, 37, *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), to keep the " 'arbitrary and capricious' standard firmly in mind." [21]

[The arbitrary and capricious] standard of review is a highly deferential one. It presumes agency action to be valid. Moreover, it forbids the court's substituting its judgment for that of the agency, and requires affirmance if a rational basis exists for the agency's decision.

This is not to say, however, that we must rubber-stamp the agency decision as correct. To do so would render the appellate process a superfluous (although time-consuming) ritual. Rather, the reviewing court must assure itself that the agency decision was "based on a consideration of the relevant factors." Moreover, it must engage in a "substantial inquiry" into the facts, one that is "searching and careful."

. . .

A court does not depart from its proper function when it undertakes a study of the record, hopefully perceptive, even as to the evidence on technical and specialized matters, for this enables the court to penetrate to the underlying decisions of the agency, to satisfy itself that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent.

*Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 392, 444 F.2d 841, 850 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971).

There is no inconsistency between the deferential standard of review and the requirement that the reviewing court involve itself in even the most complex evidentiary matters; rather the two indicia of arbitrary and capricious review stand in careful balance. The close scrutiny of the evidence is intended to educate the court. It must understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed

---

**21.** Although *Ethyl Corp.* involved review of the Administrator's action in promulgating regulations, it is clear that the "arbitrary and capricious" standard is also the appropriate standard in reviewing agency decisions *not* to take action. *See Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975).

by the agency and those bypassed; the choices open to the agency and those made. . . . The immersion in the evidence is designed *solely* to enable the court to determine whether the agency decision was rational and based on a consideration of the relevant factors . . . .

*Ethyl Corp.*, 541 F.2d at 34–36 (Citations & footnotes omitted).

### (2) The Commission's Findings and Conclusions.

Judicial review of the SEC's decision here challenged by plaintiffs must begin with Securities Release No. 5627, issued by the Commission on October 14, 1975. 40 Fed. Reg. 51,656. This Release, which followed extensive public input (described in section II, *supra*) and staff analysis, announced the Commission's conclusions and proposals for further rulemaking with regard to the additional disclosure requirements sought by plaintiffs herein.

As a threshold matter, the Commission concluded that it has broad discretion under the securities laws to determine what matters are appropriate for disclosure, but that its discretion is limited "by the requirement that the Commission determine [that the] disclosure of such matters is either necessary to discharge the Commission's obligations under the Acts or is necessary or appropriate in the public interest or for the protection of investors." [22] The Commission then emphasized that it interpreted the securities laws and their legislative history to mean that Congress intended the Commission to exercise its disclosure authority primarily "to require the dissemination of information which is or may be economically significant." [23] Thus, it concluded, its broad rulemaking authority is

limited to contexts related to the objectives of the federal securities laws. Specifically, insofar as is relevant here, the Commission may require disclosure by registrants under the Securities Act and the Securities Exchange Act if it believes that the information would be necessary or appropriate for the protection of investors or the furtherance of fair, orderly and informed securities markets or for fair opportunity for corporate suffrage. Although disclosure requirements may have some indirect effect on corporate conduct, the Commission may not require disclosure solely for this purpose. [24]

The Commission noted that in exercising its disclosure authority in "contexts related to the objectives of the securities laws" it has to balance investor interest in extensive disclosure on various matters against (1) the danger of "excessive and possibly confusing detail" that might result in disclosures so voluminous that they would be less useful to investors generally, and (2) the cost of such disclosures to registrants, and ultimately to their shareholders. [25] It further noted that it

has generally resolved these various competing considerations by requiring disclosure only of such information as the Commission believes is important to the reasonable investor—"material information." 17 C.F.R. §§ 230.405(1), 230.408, 240.12b–20, and 240.14a–9(a). This limitation is believed necessary in order to ensure meaningful and useful disclosure documents of benefit to investors generally without unreasonable costs to registrants and their shareholders. [26]

---

22. 40 Fed.Reg. at 51,658.

23. 40 Fed.Reg. at 51,658.

24. 40 Fed.Reg. at 51,660.

25. 40 Fed.Reg. at 51,659–60.

26. 40 Fed.Reg. at 51,660. Although the Commission has "generally" not required disclosures that it did not consider "material," *see* note 12 *supra* and accompanying text, it is clear that the Commission has the authority,

pursuant to the various provisions of the securities laws, *see* section III, *supra,* to require registrants to disclose "nonmaterial" but economically significant information. The Commission specifically adopts this position in its November 2, 1976 response to the *amicus curiae* memorandum of the Southeast Legal Foundation. At pp. 2–3 of that response, the Commission states that the Supreme Court's recent opinion in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 463, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), supports the Commission's

With regard to the impact of NEPA on its rulemaking authority, the Commission concluded that NEPA did not authorize it to require disclosure by registrants of the environmental effects of their activities *solely* to promote environmental protection: in other words, that NEPA did not "give explicit content" to the phrase "public interest" which is included in certain of the primary statutory provisions[27] that give the Commission its disclosure authority.[28] Rather, it concluded that "NEPA authorizes and requires the Commission to consider the promotion of environmental protection 'along with other considerations' in determining whether to require affirmative disclosures by registrants" under the securities laws.[29]

After reaching the above-described conclusions about its statutory authority, the Commission examined five environmental disclosure alternatives that were proposed in its public proceeding. They were: (1) comprehensive disclosure of the environmental effects of corporate activities; (2) disclosure of corporate noncompliance with applicable environmental standards; (3) disclosure of all pending environmental litigation; (4) disclosure of general corporate environmental policy; and (5) disclosure of all capital expenditures and expenses for environmental purposes.[30] The Commission rejected alternatives (1), (3), (4), and (5), but decided to adopt alternative (2). Accordingly, the Commission

proposed for comment amendments to certain registration and reporting forms and rules 14a–3 and 14c–3 under the Securities Exchange Act which would, where applicable, require a registrant to provide as an exhibit to certain documents filed with the Commission a list of the registrant's most recently filed environmental compliance reports which indicate that the registrant has failed to satisfy, at any time within the previous twelve months, environmental standards established pursuant to a federal statute. In addition, the proposed amendments would, except for purposes of Forms 10 and 12 under the Exchange Act, require the registrant to undertake promptly to provide to investors copies of the reports listed, upon written request and the payment of a specified reasonable fee.[31]

The Commission rejected alternative (1), which would have required comprehensive disclosure of the environmental effects of corporate activities, for several reasons.[32] First, it concluded that investors were more interested in whether corporations were acting in "an environmentally unacceptable

authority to promulgate disclosure rules "even absent a showing that, in every case, the matter rises to the level of being economically material." This Court agrees with the Commission that it clearly has such rulemaking authority.

It is of considerable significance whether the Commission compels the disclosure of information by deeming such specific information "material," *see, e. g.,* note 13 *supra,* or whether it promulgates rules requiring the disclosure of identical information "as necessary or appropriate in the public interest or for the protection of investors." In particular, by deeming information "material," the Commission exposes registrants to potential civil damage suits by investors pursuant to 15 U.S.C. §§ 77k, 77*l*, 78r, or pursuant to 15 U.S.C. § 78n (private right of action implied, *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964)); omission of the same required information if not deemed "material" would merely subject a registrant to Commission enforcement pursuant to 15 U.S.C. §§ 77t, 78u. Thus, while the Commission, in considering the advisability of

deeming information "material," must assess the costs and benefits of potentially exposing registrants to substantial civil liability, *cf. TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. at 448–49, 96 S.Ct. 2126; no similar assessment of such costs and benefits would be necessary in considering whether to require the disclosure of the same information pursuant to the Commission's "necessary or appropriate in the public interest or for the protection of investors" authority. *Cf. id.* at 463, 96 S.Ct. 2126.

27. *See* section III, *supra.*

28. 40 Fed.Reg. at 51,661.

29. 40 Fed.Reg. at 51,662.

30. 40 Fed.Reg. at 51,662.

31. 40 Fed.Reg. at 51,663.

32. The Commission expressly noted that this alternative had been proposed by plaintiff Natural Resources Defense Council.

manner" than whether, and to what extent, corporations had gone beyond what is expected of them.[33] Moreover, it concluded that there was virtually no *direct* investor interest in such voluminous disclosures. In other words, almost all investors would not themselves analyze the comprehensive disclosures, but would instead rely on the opinions of independent analysts, and these opinions, in the Commission's view, added little but "diversity of viewpoint" to the extant federal environmental standards. The Commission further determined that it was unable to identify any established, uniform method of describing comprehensively the environmental effects of corporate activities, and it therefore concluded that both the costs to registrants and the administrative burdens of such a comprehensive disclosure requirement would be "excessive."[34] Although the Commission noted that it could attempt to develop its own guidelines and standards to eliminate these problems, it determined that the costs of such an undertaking would be "prohibitive" and, because of the responsibilities of the Environmental Protection Agency and the Council on Environmental Quality, would be "duplicative and of questionable propriety."[35] Finally, the Commission concluded that the disclosures required by this alternative would be subjective and "would not lend themselves to comparisons of different companies," which the Commission felt was important to investors choosing between competing investment opportunities.[36] For all of the above reasons, the Commission concluded that "the additional costs and burdens [of such disclosure] greatly outweigh resulting benefits to investors and the environment."[37]

The Commission also rejected alternatives (3), (4), and (5). Alternative (3) would have required the disclosure of *all* pending environmental litigation. As indicated above, existing SEC regulations already required registrants to disclose all environmental proceedings initiated by a government authority and all nongovernmental civil actions if the amounts involved, individually or in the aggregate, exclusive of interest and costs, exceed 10% of the current assets of the registrant and its subsidiaries on a consolidated basis.[38] The Commission concluded *not* to expand these extant requirements to include all nongovernmental proceedings because it found "no method by which to screen out nongovernmental actions which are substantially without merit or to ascertain whether any damages sought have been substantially inflated."[39] Alternative (4) would have required registrants to disclose their general environmental policy. The Commission rejected such a requirement because it would result in "subjective disclosures largely incapable of verification and highly susceptible to public relations presentations."[40] Alternative (5) would have required registrants to disclose all capital expenditures and expenses for environmental purposes. The Commission concluded that such disclosure would not generally serve as a "meaningful index of corporate environmental practices" because they are "a function of a number of factors, including the extent to which the corporation's activities have a significant effect on the environment or have in the past been subjected to environmental controls."[41]

In addition to these findings and conclusions with respect to the five specific environmental disclosure regulations before it, the Commission also made a number of other significant findings, although it is not clear from the administrative record whether and to what extent these findings con-

**33.** 40 Fed.Reg. at 51,662.

**34.** 40 Fed.Reg. at 51,662.

**35.** 40 Fed.Reg. at 51,662 n. 44.

**36.** 40 Fed.Reg. at 51,662.

**37.** 40 Fed.Reg. at 51,662.

**38.** Securities Act Release No. 5386, 38 Fed.Reg. 12,100 (1973).

**39.** 40 Fed.Reg. at 51,663.

**40.** 40 Fed.Reg. at 51,663.

**41.** 40 Fed.Reg. at 51,663.

tributed to the Commission's ultimate conclusions. Specifically, the Commission found that the investor-participants who favored the disclosure of environmental information did so because they felt that such information was "economically significant." [42] In addition, the Commission inferred from the testimony of such investor-participants that they would utilize environmental information more in making voting rather than investment decisions.[43] Finally, the Commission found that

> disclosure to investors of information reflecting corporate compliance with existing environmental standards might have some indirect effect on corporate practices to the benefit of the environment. It seems clear that investors do not at present have ready access to objective information concerning the environmental practices of corporations. And although the relevant compliance reports are reasonably accessible to inhabitants of the localities most directly affected by such practices, there is presently no single governmental source to which an investor can look for the environmental reports filed by a company.
>
> Given the fact that there is a degree of interest among some investors in information regarding corporate environmental practices, we conclude that the availability of such information may result in some investor or shareholder action.[44]

As indicated above, the only new environmental disclosure requirement actually proposed for comment by the Commission concerned corporate noncompliance with environmental standards established pursuant to federal statutes. After receiving over 200 letters of comment during the comment period on this additional disclosure requirement, the Commission decided not to implement the proposed requirement.[45] Its stated reason for this action was that "requir-

ing the listing and availability of environmental compliance reports would not provide additional meaningful information to investors interested in the environmentally significant aspects of the behavior of registrants." [46] The Commission's primary concern with its proposal appears to have been that the disclosure of compliance reports fails to distinguish between *de minimus* and significant violations of federal standards. It was also concerned about the technical nature of the contents of compliance reports and about the incomparability among various types of reports.

The Commission considered some modifications to its proposal to avoid such problems. However, it concluded that no "definitive and universal standard can be developed to insure that only reports which relate to 'significant' noncompliance with existing environmental standards would be listed by registrants." [47] The Commission specifically noted that it had considered the possibility of requiring registrants to provide a brief narrative description of the information contained in the reports of noncompliance. It concluded, however, that

> allowing each registrant to apply its own notions of significance would compound, rather than lessen, the difficulty in comparing the environmental performance of different companies. In addition, such a narrative would merely produce information largely duplicative of that already disclosed by registrants.[48]

The Commission also considered the possibility of requiring registrants to disclose violations of environmental standards which were not reported to governmental authorities. It concluded, however, that its existing disclosure rules with regard to "material" information were adequate in this regard inasmuch as they already required such disclosure where "the average

---

42. 40 Fed.Reg. at 51,664.

43. 40 Fed.Reg. at 51,664–65.

44. 40 Fed.Reg. at 51,665.

45. Securities Act Release No. 5704, 41 Fed.Reg. 21,632 (1976).

46. 41 Fed.Reg. at 21,632.

47. 41 Fed.Reg. at 21,634.

48. 41 Fed.Reg. at 21,634.

prudent investor ought reasonably to be informed." [49] Moreover, the Commission said, it

does not believe that NEPA was intended to compel it to impose environmental compliance monitoring and reporting requirements more extensive than those created and administered by government authorities charged with substantive regulation of environmental practices.[50]

Thus, the Commission concluded that its proposed requirement for disclosure of environmental compliance reports, with or without modifications, "would be of little value at best, and misleading at worst," and that the burdens of such a requirement therefore outweighed its benefits to investors and to the environment.[51]

The Commission also gave consideration to another environmental disclosure alternative. This alternative, proposed by CEQ, would require registrants "to prepare summaries of significant information which they gather in order to obtain federal, state and local permits, licenses, approvals, or variances, to register new products, to report spills and to monitor discharges and emissions, or for other corporate purposes." [52] The Commission concluded that such disclosure was "not designed to, and would be unlikely to, produce informa-

tion of the type which investors appear to be interested in." [53] To the extent that the disclosure of such summaries would promote environmental goals, the Commission felt that it was the "responsibility of the government authorities which receive such information in the first place" to make such information available.[54] "In any event," concluded the Commission,

in the absence of any indication that the substantial costs involved in such summarization would be outweighed by the resulting benefits, a determination which appears to be totally beyond the scope of our expertise, any such undertaking would clearly be inappropriate.[55]

In sum, therefore, as a result of its lengthy proceeding, the Commission determined *not* to require disclosures of environmental information in addition to those already required under its existing rules.

### (3) Judicial Review of the Commission's Findings and Conclusions.

 The Court has scrutinized the Commission's findings and conclusions "to determine whether the agency decision was rational and based on a consideration of the relevant factors." *Ethyl Corp.*, 541 F.2d at 36, *quoted supra*.[56] In particular, the Court

**49.** 41 Fed.Reg. at 21,634. *See* text at note 12 *supra*.

**50.** 41 Fed.Reg. at 21,634.

**51.** 41 Fed.Reg. at 21,634.

**52.** 41 Fed.Reg. at 21,634. *See* CEQ Statement, Jt. Appendix, 145, 153–58.

**53.** The Commission specifically expressed its disagreement with the Council's determination that NEPA requires the SEC to require disclosure of environmental information of interest to persons and entities that are not investors.

**54.** 41 Fed.Reg. at 21,634.

**55.** 41 Fed.Reg. at 21,634.

**56.** As an initial matter, both plaintiffs and defendant have addressed at length the issue of whether NEPA authorizes the SEC to impose environmental disclosure requirements on registrants *solely* to promote environmental goals; in other words, when such disclosure would neither be necessary nor appropriate for "the

protection of investors, or the furtherance of fair, orderly and informed securities markets, or for fair opportunity for corporate suffrage." 40 Fed.Reg. at 51,660. While there is no reason to think that NEPA does not confer such substantive authority on the Commission, *cf. Environmental Defense Fund, Inc. v. Mathews*, 410 F.Supp. 336 (D.D.C.1976), this Court need not rule on this issue, for the Commission itself recognized that those investors interested in environmental disclosure were "virtually unanimous" in stating that such disclosure would reveal information of *economic significance* to them as investors. 40 Fed.Reg. at 51,664. While information having "economic significance" may not in all cases be "material information" as the Commission now defines that term, there can be no doubt that the Commission has the authority to require registrants to disclose "nonmaterial" information that has economic significance. *See* note 26 *supra* and accompanying text. *Cf. NAACP v. FPC*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976) (FPC authorized to consider consequences of discriminatory employment practices to the ex-

has studied the Commission's "transitions from its facts to its ultimate conclusions." Leventhal, *Environmental Decisionmaking and the Role of the Courts,* 122 U.Pa.L.Rev. 509, 540–41 (1974). On the basis of this review, the Court finds that the Commission's decisionmaking process as a whole was marred by serious and fundamental defects and that its rejection of certain specific disclosure alternatives was not rationally based, at least insofar as appears from the Commission's statement of reasons in support of its decision, and is not sustainable on the present administrative record. Accordingly, the Court must conclude that the Commission's final decision not to impose any additional environmental disclosure requirements was arbitrary and capricious, and therefore the Court must remand this matter once again to the Commission for further proceedings.

First, in considering the various environmental disclosure alternatives, the Commission assessed the benefits and costs of each such alternative as though all such disclosures necessarily must be "across-the-board": In other words, a fundamental

premise of the Commission's decisionmaking appears to have been that any disclosure requirement must apply equally to *all* filings with the Commission and/or communications with shareholders and the public. In particular, the Commission failed to consider the possibility of requiring disclosure of environmental information to shareholders (persons presently owning shares of a registrant corporation) solely in connection with proxy solicitations and information statements (provided to shareholders in connection with annual or other meetings) in order to promote "fair opportunity for the operation of corporate suffrage [57]" without requiring identical disclosure in registration statements, prospectuses, and the like. The failure to consider such a possibility is particularly significant in view of the Commission's own conclusions that (1) "insofar as the Commission's rulemaking authority under Section 14(a) of the Securities Exchange Act is concerned, the primacy of economic matters, particularly with respect to shareholder proposals, is somewhat less," [58] and (2) investors would utilize environmental information more in making voting decisions than in making investment

tent relevant to its duty to establish just and reasonable rates in the public interest). *See also Flint Ridge Development Co. v. Scenic Rivers Association,* 426 U.S. at 792, 96 S.Ct. 2430 (HUD authorized to require wide range of environmental information into property reports furnished to prospective purchasers to the extent such disclosures are "necessary for the protection of purchasers or in the public interest").

The Commission specifically noted three rationales advanced during the proceeding in support of the contention that the disclosure of environmental information would have economic significance: "(1) noncompliance with environmental . . . laws could lead to extensive costs and liabilities; (2) the ability to avoid such problems provides an index to management's overall quality; and (3) in the long run corporate social responsibility determines the public relations and regulatory framework in which a company operates." 40 Fed.Reg. at 51,664.

**57.** 40 Fed.Reg. at 51,659, *quoting SEC v. Transamerica Corp.,* 163 F.2d 511, 518 (3d Cir. 1947), *cert. denied,* 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 418 (1948).

**58.** 40 Fed.Reg. at 51,659. *See* Note, *Foreign Bribes and the Securities Acts' Disclosure Requirements,* 74 Mich.L.Rev. 1222, 1225 (1976).

As the Court of Appeals for this Circuit said in *Medical Committee for Human Rights v. SEC,* 139 U.S.App.D.C. 226, 432 F.2d 659 (1970), *vacated as moot,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972):

[T]he clear import of the language, legislative history, and record of administration of section 14(a) is that its overriding purpose is to assure to corporate shareholders the ability to exercise their right—some would say their duty—to control the important decisions which affect them in their capacity as stockholders and owners of the corporation. Thus, the Third Circuit has cogently summarized the philosophy of section 14(a) in the statement that "[a] corporation is run for the benefit of its stockholders and not for that of its managers." *SEC v. Transamerica Corp.,* 163 F.2d 511, 517 (3d Cir. 1947), *cert. denied,* 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 418 (1948).

In view of this recognized importance of ensuring that shareholders have the ability to exercise responsibly their rights of corporate suffrage, a separate analysis of the costs and benefits of environmental disclosure for shareholders seems particularly appropriate.

decisions.[59] Moreover, the Commission's failure to assess separately the benefits of disclosure solely to shareholders in connection with voting matters was manifestly inappropriate in view of the Commission's insistence that environmental disclosures not be subjective so that investors could make inter-corporate comparisons. In assessing the benefits of alternative (1),[60] alternative (2),[61] and the CEQ proposal,[62] the Commission appears to have concluded that the disclosures that these alternatives would require would be of limited benefit since they would not provide investors with a meaningful basis for choosing among competing investment opportunities. However, inter-corporate comparison would not, it seems, be of primary importance to shareholders concerned with intra-corporate voting matters. Likewise, the Commission's failure to assess separately the costs of requiring such environmental disclosures to be provided to shareholders in connection with voting matters, or of requiring that such disclosures be filed with the Commission so that interested shareholders could obtain information about their corporation's environmental activities, was clearly inappropriate.

Second, in connection with its rejection of certain disclosure alternatives, the Commission made several findings with regard to the cost and/or feasibility of developing appropriate disclosure guidelines and standards specifically tailored for environmental information and with regard to the costs of compliance with and administration of the various alternatives. Thus, in rejecting alternative (1), the Commission stated that the costs to registrants of complying with and the administrative burden of the comprehensive disclosure requirement would be "excessive,"[63] and that the costs of the Commission developing its own guidelines and standards would be "prohibitive."[64] In rejecting alternative (2), the Commission concluded that no "definitive and universal standard [of 'significant' noncompliance] can be developed."[65] Finally, in rejecting the CEQ alternative, the Commission concluded that the costs of summarization would be "substantial."[66] None of these conclusions, however, is supported by any underlying findings of fact; all merely stand as bald assertions by the Commission. It does not appear that the Commission ever engaged in serious consideration of the costs and benefits of developing standards and guidelines, nor does it appear that the Commission, in reaching these conclusions, was relying on cost/benefit studies conducted by anyone outside the Commission. There appears to have been little, if any, effort on the part of the Commission to seek outside expert advice with regard to the costs and feasibility of developing guidelines and standards for the disclosure of environmental information, and there appears to have been little, if any, effort on the part of the Commission to work constructively with registrants and with interested individuals and organizations to develop such guidelines and standards.[67] In view of the total dearth of support for its

59. See text at note 43 supra.

60. See text at note 36 supra.

61. See text at note 48 supra.

62. See text at note 53 supra. The Commission's failure to distinguish between the interests of investors in general and those of shareholders in particular suggests that the Commission's conclusion as to the general nature of "investor interest," i. e., its conclusion that investors are more interested in whether corporations were acting in "an environmentally unacceptable manner" than whether, and to what extent, corporations had gone beyond what is expected of them, see text at note 33 supra, might have been different if the Commission had analyzed shareholders separately.

63. See text at note 34 supra.

64. See text at note 35 supra.

65. See text at note 47 supra.

66. See text at note 55 supra.

67. At least two organizations, the Council on Economic Priorities and the American Institute of Certified Public Accountants Special Task Force, specifically testified at the Commission's rulemaking proceeding that the development of standards and guidelines for environmental disclosure was feasible.

conclusions with regard to costs and feasibility, and in view of its failure to make any serious effort to develop standards and guidelines, the Court must conclude that the Commission's ultimate balancing of costs and benefits was not based on a consideration of the relevant factors and is not sustainable on the administrative record. *See Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission*, 547 F.2d at 646, 651.

Third, the Commission, in reaching its conclusions, did not comply with NEPA's *procedural* mandate, which, as described in subsection B, *supra*, requires the Commission "to the *fullest* extent possible under its statutory obligation [to] consider alternatives to its actions which would reduce environmental damage."[68] In particular, the Commission's failure to make a serious effort to develop appropriate guidelines and standards for the disclosure of environmental information contravenes the mandate of section 102(2)(B) of NEPA, which directs the Commission to the fullest extent possible to

> [i]dentify and develop methods and procedures, in consultation with the Council on Environmental Quality, . . . which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations.

Moreover, the Commission contravened the general procedural mandate of section 102(1) of NEPA[69] by rejecting the CEQ alternative on the grounds that (1) "it was the responsibility of the government authorities which receive such information in the first place" to make such information available,[70] and (2) the determination of the benefits of such disclosure was totally beyond the Commission's expertise.[71] Similarly, it violated section 102(1) to the extent that it based its rejection of alternative (1) on its conclusion that comprehensive disclo-

sure would be of "questionable propriety" because of the responsibilities of the EPA and the CEQ.[72] Section 102(1) requires the Commission, and all federal agencies, to administer the policies, regulations, and laws of the United States *to the fullest extent possible* in accordance with the policies of NEPA. As the Supreme Court said in *Flint Ridge*, "the phrase [to the fullest extent possible] is a deliberate command that the duty NEPA imposes upon the agencies to *consider* environmental factors not be shunted aside in the bureaucratic shuffle." 426 U.S. at 787, 96 S.Ct. at 2437, *quoted supra*. Yet, the Commission, by basing its decision not to require additional disclosures of environmental information at least in part on its belief that other federal agencies have the necessary expertise and should take the initiative to require disclosure if any is appropriate, clearly shunted aside environmental factors in the bureaucratic shuffle. At the very least, NEPA requires the Commission either to develop such expertise as is necessary to consider fully the benefits and costs of environmental disclosure or to involve in its decisionmaking process such other agencies as have the requisite expertise. It is patently insufficient for the Commission to assert its lack of expertise as one reason for not developing fully a factual record that would permit a reasoned assessment of the costs and benefits of environmental disclosure. Similarly, the Commission's "deference" to other agencies, such as the CEQ and EPA, which the Commission believed should assume the responsibility for establishing disclosure requirements, also contravenes section 102(1). Just as an agency cannot omit the consideration in an impact statement prepared pursuant to section 102(2)(C) of alternatives not within its authority, *see Natural Resources Defense Council, Inc. v. Morton*, 148 U.S.App.D.C. 5, 458 F.2d 827, 835–38 (1972), so too it cannot refuse to give serious con-

---

**68.** *Calvert Cliffs'*, 449 F.2d at 1128, *quoted supra*.

**69.** *See* section IV(B) *supra*.

**70.** *See* text at note 54 *supra*.

**71.** *See* text at note 55 *supra*.

**72.** *See* text at note 35 *supra*.

.sideration to environmental factors merely because it thinks that another agency should assume the responsibility for promoting the policies of NEPA. *See* S.Rep.No. 91–296, 91st Cong., 1st Sess. 18–19 (1969).

In addition to these general "flaws" in the Commission's decisionmaking process, the insufficiency of the Commission's explanation of some of its reasons for rejecting several of the specific disclosure alternatives suggests that the Commission's assessment of these alternatives might not have been entirely rational. Thus, the Commission's conclusion with respect to alternatives (1) and (2) that the proposed disclosure would be "duplicative"[73] is left unexplained. In the absence of such an explanation, the Court is unable to determine with sufficient certainty whether this conclusion is fundamentally inconsistent with the Commission's finding that "investors do not at present have ready access to objective information concerning the environmental practices of corporations."[74] Similarly, in the absence of more complete explanation, the Court is unable to assess whether the relative absence of "direct" investor interest in environmental information is in fact a relevant consideration and how it com-

pares, for example, with investor interest in various financial disclosures.[75] Finally, in connection with the Commission's rejection of alternative (5), the Court is unable to comprehend without a more complete explanation why the fact that the capital expenditure disclosures proposed thereby would be "a function of a number of factors, including the extent to which the corporation's activities have a significant effect on the environment or have in the past been subjected to environmental controls"[76] deprives such disclosures of meaningfulness.

For all of these reasons,[77] the Court must conclude that the Commission's decision not to impose additional environmental disclosure requirements on registrants was arbitrary and capricious. Certainly, the Commission's decision was not the product of the "imaginative exercise" of its rulemaking authority envisioned by NEPA and this Court's earlier opinion. 389 F.Supp. at 702. Accordingly, the Court must remand this case to the Commission for further proceedings consistent with this opinion to determine whether additional environmental disclosure requirements would be appropriate to protect investors, to encourage corporate suffrage, and to bring the Commission into

---

**73.** *See* text at notes 35 and 48 *supra.*

**74.** *See* text at note 44 *supra.*

**75.** *See* text following note 33 *supra.*

**76.** *See* text at note 41 *supra.*

**77.** By focusing on particular findings, conclusions, reasons, and omissions of the Commission, the Court does not intend to suggest that no other parts of the decisionmaking process should be reconsidered by the Commission in the course of the further proceedings required by the Court's decision. For example, the Commission concluded that only an "insignificant percentage" of all investors are interested in environmental disclosures. 40 Fed.Reg. at 51,663. It appears that the Commission derived this conclusion solely from the number of investors that participated in the rulemaking proceeding. While the Court recognizes that precise data on investor/shareholder interest is not easily generated, the Commission's basis for estimation appears to be arbitrary. Thus, to the extent that the Commission was influenced in its ultimate decision by its conclusion that only an "insignificant percentage" of in-

vestors are interested in such disclosures, a reconsideration of this issue by the Commission should probably be undertaken. The Court further notes that the Commission has recently undertaken enforcement actions against a number of corporations which the Commission has charged with not disclosing the fact and scope of illegal domestic political payments and foreign bribes. *See* Comment, *Bribes, Kickbacks, and Political Contributions in Foreign Countries—The Nature and Scope of the Securities and Exchange Commission's Power to Regulate and Control American Corporate Behavior*, 1976 Wisconsin L.Rev. 1231, 1243–48 (1976). The Court is concerned that the extent of investor interest in the environmental information (and equal employment information) sought herein may be as great, if not greater, than the investor interest in illegal political contributions and foreign bribes. In the absence of a reasoned comparison of the extent of investor interest in these matters, the Court is unable to ascertain whether the Commission gave appropriate weight to the quantum of investor interest in environmental and equal employment information.

full compliance with the letter and spirit of NEPA. *See National Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission*, 547 F.2d at 654, 655 n. 64.

## V. THE EQUAL EMPLOYMENT AND "OTHER MATTERS OF SOCIAL CONCERN" ASPECTS OF THE COMMISSION'S RULEMAKING PROCEEDING

Pursuant to this Court's Order of December 9, 1974, the Commission's rulemaking proceeding also reconsidered portions of plaintiffs' Natural Resources Defense Council and Project on Corporate Responsibility 1971 petition that sought disclosure of equal employment opportunity information of registrants. Specifically, the petition proposed that the Commission require: "(1) that certain registrants disclose 'a breakdown, in conformity with Consolidated Employer Information Reports EEO–1, showing the figures and percentages of minority or female employment in each of [nine specified job categories]'; and (2) that all registrants disclose information

'concerning any proceedings in any court or before any agency challenging compliance by [any] registrant or any subsidiary with the federal Equal Employment Opportunity Act [42 U.S.C. §§ 2000e *et seq.*] or raising questions as to registrant's compliance with Executive Order 11246 relating to discriminatory hiring practices by employers contracting with the federal government.' " [78]

In addition, the Commission considered the appropriateness of additional disclosure requirements concerning "other matters of social concern."

### A. The Commission's Blanket Rejection Of Any Additional Disclosure Requirements For Equal Employment Opportunity And Other Matters Of "Social Concern" Was Arbitrary And Capricious.

 The Commission decided not to impose any additional disclosure requirements for any "nonenvironmental" matters of social concern because "over 100 different 'social matters' were submitted in which 'ethical investors' were said to be interested." [79] The Commission determined that "there is no distinguishing feature which would justify the singling out of equal employment from among the myriad of other social matters in which investors may be interested in the absence of a specific mandate comparable to that of NEPA;" [80] and, the Commission concluded,

Disclosure of comparable non-material information regarding each of these would in the aggregate make disclosure documents wholly unmanageable and would significantly increase the costs to all involved without, in our view, corresponding benefits to investors generally. [81]

The Commission also indicated particular reasons why it would not implement the equal employment opportunity disclosure requirements proposed by plaintiffs' petition. It concluded that a requirement that *all* equal employment opportunity proceedings, regardless of scope, would not "screen out actions which are without merit or . . . [in which the] damages sought have been substantially inflated." [82] The Commission concluded that its extant "materiality" standard [83] would adequately protect investors with regard to civil litigation

---

**78.** 40 Fed.Reg. at 51,665, *quoting* Plaintiffs' June 7, 1971 petition.

The Court does not now, and did not in December 1974, interpret plaintiffs' petition as requesting adoption of *only* the specific proposed rule. Rather, the petition sought general rulemaking on the appropriateness of equal employment opportunity disclosure. Compare *NAACP v. FPC*, 172 U.S.App.D.C. 32, 520 F.2d 432, 434–35 (1975), *aff'd*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976). Thus, the Commission was not "free to consider that [the

particular proposal] was the only request made." *Id.* at 447.

**79.** 40 Fed.Reg. at 51,666.

**80.** 40 Fed.Reg. at 51,666.

**81.** 40 Fed.Reg. at 51,666.

**82.** 40 Fed.Reg. at 51,666.

**83.** *See* note 12 *supra* and accompanying text.

alleging violations of equal employment opportunity laws and regulations by registrants. With regard to the petition's proposal that registrants be required to file with the Commission EEO–1 Reports containing statistical data about their work force composition, the Commission admitted that such information might be significant is some cases, but concluded that disclosure of such statistical information was not warranted because "meaningful interpretation is dependent upon sophisticated analysis and other information such as the makeup of the available labor pools and existing hiring and promotion practices." [84]

These reasons articulated by the Commission in support of its decision not to require any disclosure of "nonmaterial" equal employment opportunity information, despite its economic significance,[85] demonstrate that the Commission's decision was arbitrary and capricious. First, the Commission's conclusion that equal employment opportunity information could not be distinguished from "over 100" other matters of social concern demonstrates that the Commission made no attempt to analyze *either* the economic significance of equal employment opportunity matters *or* the costs

and/or feasibility of devising appropriate disclosure guidelines. Even a cursory examination of the "over 100" matters deemed equivalent to equal employment opportunity reveals that most, perhaps even all, of these other matters of social concern are substantially less likely than equal employment opportunity to result in significant future financial liabilities to registrants. Moreover, information concerning few, if any, of these other matters is as easily and inexpensively collected and disclosed by registrants as equal employment opportunity information.[86] It is sufficient merely to recite the "other matters of social concern" equated to equal employment opportunity to demonstrate this fact:

> advertising practices; all advertising costs; "false" advertising; contract disputes; patent disputes; compliance with antitrust laws; limitations on competition; concentration in an industry; consumer protection activities and consumer affairs posture; any activities likely to lead to litigation; all litigation (issues, disposition); all litigation but for that settled or dismissed without conformance of corporate activities to the substance of the complaint; degree of compliance with

---

**84.** 40 Fed.Reg. at 51,666. The Commission also suggested that disclosure of EEO–1 forms, if required to be filed by the Commission, might be prohibited by statute, 42 U.S.C. § 2000e–8(e). Although the Commission expressly disclaimed reliance on this issue, the Court finds it necessary to indicate for purposes of the remand herein ordered that it appears well-settled that the disclosure of EEO–1 forms by agencies other than the EEOC is not proscribed by § 2000e–8(e). *See, e. g., Sears, Roebuck and Co. v. GSA*, 166 U.S.App. D.C. 194, 509 F.2d 527, 529 (1974); *Metropolitan Life Insurance Co. v. Usery*, 426 F.Supp. 150, 157 (D.D.C.1976). Likewise, the information contained in the EEO–1 forms has generally been held not to be trade secrets or otherwise confidential information that would cause harm to a company's competitive position. *See, e. g., Metropolitan Life Insurance Co. v. Usery*, 426 F.Supp at 159, 165.

**85.** The Commission found that the investor participants in the proceeding "were virtually unanimous in stating that such information is economically significant." 40 Fed.Reg. at 51,-666. The reasons why such disclosures were considered to be economically significant to those investors that testified were the same as

those cited to show why environmental disclosures were economically significant. *See* note 56 *supra*. In addition to the potential of large back pay judgments as a result of discriminatory employment practices, a registrant could be barred from government contracts by Executive Order 11246, 30 Fed.Reg. 12,319 (1965), *as amended* by Executive Order 11375, 32 Fed. Reg. 14,303 (1967).

**86.** The Court expressly reaffirms its initial impression that the disclosures that plaintiffs seek, particularly the EEO–1 forms that are already required to be prepared by other agencies, appear to be "non-onerous." *See* 389 F.Supp. at 702.

*See generally NAACP v. FPC*, 172 U.S.App. D.C. 32, 520 F.2d 432, 446–47 (1975), *aff'd*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976) ("[T]hose sections [of the proposal] providing for the annual filing with the Commission of a form already due the EEOC . . . might well be viewed as [an] orderly [method] of bringing to the Commission's attention information which could be relevant to its [ratemaking proceedings] . . . .")

applicable regulations; all government hearings; all agency actions; a textual summary of agency actions; charitable contributions; company activities undertaken without a goal of profit maximization; community activities; *commitment to the "human community"*; corporate external relations; "good things a company has done;" financial practices; energy conservation; distribution of resources; investment practices; marketing practices; pricing practices; *expenditures in the land grant college system*; receipt of federal subsidies; corporate practices that are damaging to "interests of other investors," the "overall economy," or to "property;" biographical information, including race and sex, regarding directors; interlocking directorates; the existence of a corporate environmental department; control within a corporation; the role of the board of directors; all subsidiaries; all benefits received by directors; *"commerciogenic" malnutrition*; *food production; in-house nutritional research*; registrant's impact on the world food crisis; contractual commitments to purchase crops; a division-by-division breakdown of the number of employees in agri-business companies; foreign investments; nature of operations in South Africa; U.S.–Soviet trade; marketing efforts of drug companies outside the U.S.; employment practices in foreign facilities; registrant's participation in the "flight of companies making hazardous goods to foreign countries;" registrant's participation in the Arab boycott; exports; products made in foreign countries; foreign military goods contracts; foreign beneficial ownership; purchases from, and sales to, communist countries; activities which would be illegal in the U.S. but which are conducted abroad; registrant's impact on unemployment; compliance with the Fair Labor Standards, the Occupational Safety and Health, and the National Labor Relations Acts; health hazards in plants; health standards; effects on the unionized work force of company policies and technology; employee relations other than wages, hours, and working conditions; the *psychological work environment*; pension and health protection; management opportunities for women and minorities; the costs of giving "preferential treatment" to blacks and females; safety records; employee training and education; employee benefits, relations and satisfactions; *discrimination against persons less than six feet tall*; lobbying efforts; political influence; political contributions; all products by brand name; all product lines; product-by-product financial statements; product purity (recalls, reasons for corrective action); toxic substances produced; product reliability; customer complaints; tobacco products manufactured; *alcoholic beverages produced*; gambling equipment manufactured; strip mining; defense contracts and military goods produced; nuclear energy production; banking operations; with respect to agricultural machinery companies, manpower displacement research; tax loophole savings; tax law compliance; all state and federal tax returns; all tax disputes; beneficial ownership; racial justice; prospective legislation; and the willingness to disclose corporate information to shareholders.[87]

While the Commission may be justified in ultimately concluding that a disclosure requirement for equal employment opportunity information may be no more appropriate than a similar requirement for some other matters, it is patently insufficient for the Commission to lump all the above matters together without giving meaningful analysis to the economic significance of each category of information and the costs and/or feasibility of requiring the disclosure of information that is economically significant.[88]

**87.** 40 Fed.Reg. at 51,666 n. 72. (Emphasis added.)

**88.** Of course, the mere conclusion that a few other "matters of social concern" can in fact be equated to equal employment opportunity would not necessarily make the Commission's

Second, just as with its rejection of environmental disclosure requirements,[89] the Commission's failure to analyze the benefits and costs of equal opportunity disclosure in connection with proxy solicitations and information statements alone in order to promote "fair opportunity for the operation of corporate suffrage" renders the decisionmaking process arbitrary and capricious.

Finally, the Commission's conclusion that the disclosure of EEO–1 statistical data would require sophisticated analysis in order for meaningful conclusions to be derived about the registrant's susceptibility to future equal employment opportunity litigation appears to be analogous to its conclusion that there would be little "direct" investor interest in the disclosure of certain environmental information.[90] As the Court concluded with regard to the Commission's suggestion that the dearth of "direct" interest vitiates the meaningfulness of such environmental information, the Court is unable, on the basis of the record before it, to assess whether this "need for sophisticated analysis" is a relevant consideration and how it compares, for example, with the need for sophisticated analysis of various financial disclosures.

For these reasons, the Court concludes that the Commission's rejection of plaintiff's proposal to require the disclosure of equal employment opportunity information was not rationally based and is not sustainable on the present administrative record, and therefore this decision was also arbitrary and capricious. Accordingly, the Court must also remand this case to the Commission for further proceedings consistent with this opinion to consider whether equal employment opportunity disclosure requirements are appropriate.

## VI. CONCLUSION

For the reasons indicated in sections IV(C) and V of this opinion, the Court concludes that the Commission's decision not to require registrants to disclose additional environmental information and equal employment opportunity information was arbitrary and capricious. Although this proceeding has already consumed a substantial, and perhaps even an unprecedented, amount of the Commission's time, and a substantial amount of the Court's time, and despite the fact that this proceeding has been ongoing for over six years, the Court has no choice but to perform its duty of judicial review and to remand this case to the Commission. This is especially necessary because of the importance to investors and shareholders of such information as it reflects on the economic viability of investments in registrant corporations. Accordingly, the Court will require the Commission to engage in reasoned decisionmaking on the basis of an adequately-developed administrative record which has not been done to date. Therefore, the Court will grant plaintiffs' motion for summary judgment insofar as it seeks a declaratory judgment that the Commission's decision not to require registrants to disclose additional environmental and equal employment opportunity information was arbitrary and capricious. The Court will require the Commission to undertake further rulemaking in accordance with this opinion with regard to the appropriateness of such disclosure requirements, and will order the Commission to complete such further proceedings within six months of the date of this opinion.

An Order in accordance with the foregoing will be issued of even date herewith.

decision not to require disclosure of any of these matters a rational exercise of its rulemaking authority. The Commission would have to analyze the costs and benefits of requiring all such disclosures; and, even if the Commission determines that the benefits of requiring all such disclosures would be outweighed by the costs, the Commission should

consider the possibility that the disclosure of some economically-significant matters may be better than none.

**89.** *See* text at note 57 *supra*.

**90.** *See* text at note 75 *supra*.